The CITY OF WILMINGTON, a Delaware municipal corporation, Plaintiff Below, Appellant,

v.

PARCEL OF LAND KNOWN AS TAX PARCEL No. 26.067.00.004 being approximately 18.38 acres of land west of Terminal Avenue and north of and adjacent to Christina Avenue, in the City of Wilmington (Owner—Seibert Associates, L.P.), Defendant Below, Appellee.

Supreme Court of Delaware.

Submitted: March 10, 1992.

Decided: April 23, 1992.

Rehearing Denied June 4, 1992.

James S. Green (argued), and Richard A. Forsten, Duane, Morris & Heckscher and Pamela J. Scott, and Brian T. Murray, City of Wilmington Law Dept., Wilmington, for appellant.

Louis J. Finger, of counsel (argued), and Stephen E. Herrmann and David L. Finger, Richards, Layton & Finger, Wilmington, for appellee.

Before MOORE, WALSH and HOLLAND, JJ.

WALSH, Justice:

This is an appeal from an award of $2,962,500 to the owners of certain real property condemned by the City of Wilmington ("City") for expansion of the Port of Wilmington. The City, the condemning authority, contends that the Superior Court erred as a matter of law and abused its discretion in instructing the condemnation commissioners concerning the appropriate valuation standards to be applied under Delaware law.

The City raises three contentions on this appeal. First, it contends that the Superior Court erred as a matter of law in instructing the commissioners that a fluorspar processing operation, projected for the property, would not be subject to the Delaware Coastal Zone Act. Second, the City contends that the Superior Court erroneously instructed the commissioners that the owner of the property, the appellee, Seibert Associates, L.P., ("Seibert"), was entitled to compensation for the taking of riparian property rights associated with the condemned property. Finally, the City argues that the Superior Court abused its discretion by instructing the commissioners to disregard certain portions of the City's expert appraisal report.

For the reasons stated below, we conclude that the Superior Court erred as a matter of law in ruling that the Coastal Zone Act had no application to the valuation of the condemned property in this case. We find no merit in the City's remaining contentions.

## I

The City initiated its condemnation action on October 20, 1989, seeking to acquire approximately 18.38 acres of real property owned by Seibert for purposes of expanding the Port of Wilmington. The property is located on the south side of the Christina river near the point of its junction with the Delaware river and is separated from the Delaware river only by City-owned property. A portion of the Seibert property is subaqueous with 3.4 acres of land submerged under the Christina river and approximately one acre under the Lobdell Canal.

Authority for the taking was not contested and a condemnation jury[1] was empaneled to determine the value to be paid Seibert for the taking of the property. The City presented two appraisals for valuation purposes. The first prepared by Gary Parker ("Parker") fixed the value of the subject property at $1,000,000 while the second, submitted by Joseph Melson ("Melson") attributed a value of $1,885,000. Both appraisals assumed for valuation purposes that the highest and best use of the condemned property would be for general industrial pursuits such as storage, distri-

---

**1.** In a condemnation proceeding, the term "commissioners" is used rather than "jurors."

*See* 10 *Del.C.* § 6108.

bution, or warehousing. Seibert, on the other hand, introduced the appraisal of Thomas C. Reynolds, Jr. ("Reynolds") who opined in favor of a $3,711,000 valuation. Reynolds also assumed, for valuation purposes, that the highest and best use of the property would be as an import-export facility with related storage uses.

In contrast to the City's appraisals, the Reynolds' appraisal stressed two valuation elements which were given little consideration by the City's experts. Both factors became a source of dispute at trial. The Reynolds appraisal included the value of certain easements and riparian property rights owned by Seibert. It also considered the estimated value of approximately 100,000 tons of fluorspar tailings, or residual deposits, on the property which Seibert contends can be further "processed" or refined into saleable grade fluorspar.[2] Seibert estimated that the presence of the fluorspar "tailings" increases the market value of the property by as much as $909,000: $700,000 for the tailings and $209,000 salvage value for the equipment located on the property. The Reynolds appraisal assumed that the Coastal Zone Act, 7 *Del.C.* §§ 7001–7013, would not be an impediment to conducting a fluorspar processing operation on the property.

The proposed fluorspar processing operation was described in detail by a Seibert official at trial. Fluorspar processing requires the use of the flotation building and the heavy material handling equipment already on the property at the time of the taking. Raw fluorspar tailings would be excavated from the property, brought into the existing plant and put through a "separation" or "flotation" process. The raw material would be placed in a tank filled with water and agitated by a paddlewheel. Small amounts of chemical "reagents" would be added to the mixture and air

would be pumped into the bottom of the tank to assist the separation process. The saleable grade fluorspar would float to the surface to be extracted while the remaining substance known as liquid "slurry" (consisting of limestone, sand, and a smaller concentration of fluorspar "tailings") would sink to the bottom. The liquid slurry would be pumped out of the tank into a tailing pond on the property and contained by colanders while the slurry dried. The only resulting physical change in the land would be a one foot decrease in ground level which, Seibert claimed, would still leave the level of the property equal to or higher than that of the surrounding area.

Following the presentation of the evidence, including the conflicting appraisals, the Court instructed the commissioners on the applicable valuation standards. The Commissioners fixed the valuation of the taking at $2,962,500. The City contends that the Superior Court's instructions were erroneous in three particulars, each of which will be separately discussed.

## II

The City first contends that the Superior Court erred as a matter of law by instructing the commissioners that "the described fluorspar [processing] operation is neither manufacturing nor heavy industry as defined by the Act, and would be allowed under the Coastal Zone Act." *See* 7 *Del.C.* §§ 7001–7013. The City took exception to this instruction.[3] Since this issue is exclusively a question of statutory construction, "the appropriate standard of appellate review requires this Court to determine 'whether the Superior Court erred as a matter of law in formulating or applying legal principles.'" *Moses v. Bd. of Educ. of the New Castle County Vocational Technical School Dist.*, Del.Supr., 602 A.2d 61, 63 (1991) (quoting *Delaware Alcoholic*

---

**2.** Fluorspar is a mineral grade of calcium fluoride used in the ceramic and steel industries. The fluorspar deposits are the remains of a fluorspar processing operation conducted by a Seibert affiliate during the period 1954–1958.

**3.** The City objected to the Superior Court's proposed instruction by expressly noting that it

"took exception to the fact that the extraction and processing of fluorspar is neither manufacturing [n]or heavy industry as defined by the Coastal Zone Act." The Court responded "[w]e have a reporter here, so the exception is noted for the record." The City was not permitted to further articulate the basis for its objection.

*Beverage Wholesalers, Inc. v. Ayers,* Del. Supr., 504 A.2d 1077, 1081 (1986)). We review questions of law *de novo. Rohner v. Niemann,* Del.Supr., 380 A.2d 549, 552 (1977).

■ In order to determine whether a fluorspar processing operation would be subject to the Coastal Zone Act, we must first consider the scope of the regulatory statute. The Coastal Zone Act is an environmental protection measure designed to regulate closely the types of uses permitted and carried on in the area adjacent to the Delaware River, the Delaware Bay and the Atlantic ocean. The legislative purpose of the Act is set forth in 7 *Del.C.* § 7001 as follows:

> It is hereby determined that the coastal areas of Delaware are the most critical areas for the future of the State in terms of the quality of life in the State. It is, therefore, the declared public policy of the State to control the location, extent and type of development in Delaware's coastal areas. In so doing, the State can better protect the natural environment of its bays and coastal areas and safeguard their use primarily for recreation and tourism. . . .

The legislation seeks to strike the correct balance between the public policy of the State of encouraging the introduction of new industry and the competing interest of protecting the environment, natural beauty, and recreational potential of the State. *Id.* As a result, "heavy industrial"[4] uses and bulk product transfer facilities not operating in the coastal zone prior to June 29, 1971 are absolutely prohibited. 7 *Del.C.* § 7003. "Manufacturing" uses, on the other hand, are allowed by permit only. 7 *Del.C.* § 7004(a); *see Kreshtool v. Delmar-*

*va Power & Light Co.,* Del.Super., 310 A.2d 649, 652 (1973).[5] Given this broad statement of purpose and sweeping use of legislative authority, we conclude that the Act should be liberally construed in order to fully achieve the legislative goal of environmental protection. *Cf. Coastal Barge Corp. v. Coastal Zone Industrial Control Bd.,* Del.Supr., 492 A.2d 1242 (1985).

■ With that principle in mind, we next consider whether a fluorspar processing operation would be a "manufacturing" use within the meaning of the Act. The term "manufacturing" is defined as follows:

> the mechanical or chemical transformation of organic or inorganic substances into new products, characteristically using power-driven machines and materials handling equipment, and including establishments engaged in assembling component parts of manufactured products, provided the new product is not a structure or other fixed improvement.

7 *Del.C.* § 7002(d). Seibert argues that a fluorspar operation is not a "manufacturing" use under the Act because it is a "purely mechanical" process which involves the mere separation of fluorspar from other elements of the soil without any technical "transformation into new products". Seibert contends that even though minute amounts of chemical "reagents" are involved, since the process begins with fluorspar and ends with fluorspar, it cannot be deemed "manufacturing" within the purview of the Act.

We are not persuaded by Seibert's statutory analysis. Such a pinched construction of the scope of the term "manufacturing" would clearly defeat the legislative purpose of the Act "to control the location, extent

---

4. "Heavy industry use" means a use characteristically involving more than 20 acres, and characteristically employing some but not necessarily all of such equipment such as, but not limited to, smokestacks, tanks, distillation or reaction columns, chemical processing equipment, scrubbing towers, pickling equipment and waste treatment lagoons; which industry, although conceivably operable without polluting the environment, has the potential to pollute when equipment malfunctions or human error occurs. Examples of heavy industry are refineries, basic steel manufacturing plants, basic cel-

lulosic pulp-paper mills and chemical plants such as petrochemical complexes. . . . 7 *Del.C.* § 7002(e).

5. In passing upon permit requests, the following factors are considered: environmental impact; economic effect; aesthetic effect; number and type of supporting facilities; effect on neighboring land uses; county and municipal conservation plans of areas within their jurisdiction. 7 *Del.C.* § 7004.

and type of development in Delaware's coastal areas". This Court has previously rejected a literal approach to the Act's definitional standards where such reading leads to a result at variance with the legislative intent. *Cf. Coastal Barge,* 492 A.2d at 1246–47.

If the term "manufacturing" is afforded a liberal meaning the proposed fluorspar proceeding plainly is subject to regulation. The processing operation would entail the use of chemical reagents, earth moving equipment, and mechanical equipment to separate the saleable grade fluorspar from the impurities with which it is mixed in an ore-like state. Furthermore, once the separation is complete, the resultant slurry must be disposed of safely. As a Seibert official conceded at trial, "[n]obody wants to see this stuff [i.e. the slurry] to come [sic] into the river." Far from being outside the scope of the Act, we believe such an operation is precisely the type of industrial use the General Assembly intended to regulate. It is a mechanical and chemical transformation of an inorganic substance (fluorspar tailings) into a new product (saleable grade fluorspar) through the use of "power-driven machines and materials handling equipment." We, therefore, hold that the fluorspar processing operation envisioned here, if put into practice, would be a "manufacturing" activity as defined in the Coastal Zone Act and thus subject to the Act's permit procedures.

Having established that a fluorspar processing operation falls within the scope of the Coastal Zone Act, we next consider whether the applicability of the Act should have been considered by the commissioners in determining the market value of the condemned property. Seibert concedes that the reasonable probability of obtaining approval from the Coastal Zone Industrial Board for a fluorspar processing operation would be relevant to the valuation of the property, *0.040 Acres of Land v. State,* Del.Supr., 198 A.2d 7, 8 (1964), and that the determination of whether to grant or deny a permit is a discretionary matter. *Kreshtool v. Delmarva Power & Light Co.,* Del.Super., 310 A.2d 649, 652 (1973). However, Seibert contends that the granting of

a permit for a fluorspar processing operation is practically a foregone conclusion and posed no valuation issue which warranted a jury instruction.

■ We do not share the view that the securing of a permit under the Coastal Zone Act is a non-issue in this case. Even if the granting of a permit for a fluorspar processing operation is reasonably probable, the commissioners were entitled to consider the likelihood that the securing of a permit would be a lengthy and costly process. Moreover, if ultimately granted, the permit may be encumbered with various conditions and environmental restrictions requiring financial expenditures to satisfy. *See* 7 *Del.C.* § 7005. The applicability of the permit requirements of the Act arguably reduces the incremental value of the property associated with a fluorspar processing operation and, therefore, is a factor which should have been considered by the commissioners in the valuation process. Accordingly, we conclude that the Superior Court erred as a matter of law in instructing the commissioners that the Coastal Zone Act would have no application to the valuation of the condemned property in this case.

### III

Although our ruling that the trial court incorrectly instructed the condemnation commissioners concerning applicability of the Coastal Zone Act requires a remand for a new hearing, we address the remaining claims of error asserted by the City for the guidance of the Superior Court in the event of a retrial.

The City next claims error in the Superior Court's instruction that Seibert was entitled to compensation for the taking of riparian rights associated with the condemned property. The City objects to the implication that the taking of riparian rights requires incremental compensation separate and apart from that awarded for the taking of the condemned property itself. The Superior Court instructed the commissioners regarding riparian rights as follows:

As to Riparian rights, you are instructed that the named defendants have Riparian rights to the land under the Christina river which abuts its property. These rights include the right to build a wharf, a pier or bulkhead and to fill the ground thereunder subject only to the reasonable probability of getting permits. Permits may not be arbitrarily withheld by any Governmental agency. With regard to these rights, you should take into consideration that the defendants' owner is entitled to be compensated for these Riparian rights, even if the land under the Christina river is already owned by the City of Wilmington.

Riparian rights are property and have value and cannot be taken by the City of Wilmington without just compensation.

Since the existence and scope of common law property rights are questions of law, our review of this ruling is plenary. *Judge v. Rago*, Del.Supr., 570 A.2d 253, 255 (1990).

██ The scope of riparian property rights under Delaware law has never been fully addressed by this Court. However, in the case of *State ex rel. Buckson v. Pennsylvania Railroad Co.*, Del.Super., 228 A.2d 587, 594 (1967), *aff'd*, Del.Supr., 267 A.2d 455 (1969), the Superior Court described a riparian owner as "one who owns land on the bank of a river, or as one who is the owner of land along, bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a river." *Buckson*, Del.Super., 228 A.2d at 594. This court further stated that title to riparian property extends from the upland to the low water mark. *Buckson*, Del.Supr., 267 A.2d at 459. The foreshore, that portion of riparian property which fronts a navigable river, "is a distinct class of property right in tidal waters and is capable of independent ownership." *Buckson*, Del.Super., 228 A.2d at 598; *accord Port Clinton Associates v. Board of Selectmen of the Town of Clinton*, 217 Conn. 588, 587 A.2d 126, 132 (1991) (riparian rights are in fact "property", rather than simply "rights" that constitute elements of ownership and may be separately alienated). Among the riparian property rights associated with ownership of the foreshore is the right to wharf out directly from the foreshore to the bulkhead line and the right to have free access to the navigable portion of a river. *Harlan & Hollingsworth Co. v. Paschall*, Del.Ch., 5 Del.Ch. 435, 456–57 (1882). Seibert claims that it is entitled to just compensation for the "taking" of the valuable riparian property rights associated with the condemned property. *Id.* at 457. We agree.

██ The City relies upon the decision in *Bailey v. Philadelphia, Wilmington and Baltimore Railroad Co.*, Del.Ct.Err. & App., 4 Harr. 389 (1846) to support its contention that a riparian property owner is not entitled to compensation where the State interferes with, or deprives a riparian owner of access, to a navigable waterway. In that case, Bailey, the plaintiff, owned a mill situated upon the White Clay Creek. The railroad company, in accordance with a grant from the State legislature, constructed a bridge across the creek downstream from Bailey. Bailey sued for damages because the bridge partially blocked his access to the creek. In denying compensability the Court ruled:

with regard to private property situated upon such rivers[,] [t]he owner of such property holds it, subject to the right of the public to use the stream at the will of the legislature; and if, in the use of it, *indirect damage* arises to such property, it is an inconvenience to which he must submit, unless the State makes compensation as a mere gratuity.

*Id.* at 396 (emphasis supplied). *Bailey* is of limited application here. The court simply held that a private riparian owner whose riparian property rights are incidentally or indirectly restricted, regulated, or damaged by the State, as opposed to a complete and direct taking by eminent domain, is not entitled to compensation. *Id.* at 395–98. It is well settled that the State possesses the power to regulate or restrict private riparian property rights for public purposes without the payment of compensation. *See, e.g., Buckson*, Del.Supr., 267 A.2d at 459–60; *Harlan & Hollingsworth Co. v. Paschall*, 5 Del.Ch. at 452–53; *Bailey*, 4

Harr. at 396; *accord Port Clinton Associates*, 587 A.2d at 132. *See also* Subaqueous Lands Act, 7 *Del.C.* §§ 7201–7216; Coastal Zone Act, 7 *Del.C.* §§ 7001–7013. However, it is equally clear that the State "cannot [directly] *take* [riparian rights attached to] private property for public use without [just] compensation." *Bailey*, 4 Harr. at 397 (emphasis supplied).[6] Since this case involves a complete and direct taking of Seibert's riparian property rights by eminent domain no award of compensation is complete without consideration of the separate and distinct loss of such rights occasioned by the taking. The Superior Court correctly instructed the commissioners to consider the value of the riparian property rights associated with the condemned property when determining the amount of the condemnation award.

## IV

Finally, the City contends that the Superior Court erred in instructing the commissioners to disregard certain assumptions contained in the Parker appraisal submitted by the City. The Parker appraisal was premised, *inter alia*, upon the following assumptions: (1) that approximately $4.4 \pm$ acres of submerged land was owned by the City, rather than by Seibert; and (2) that the property had been offered for sale for several years without a bona fide offer having been received. The Superior Court instructed the jury to disregard those portions of the Parker appraisal which presented these assumptions as facts. Specifically, the Court said:

> With regard to the testimony of Gary V. Parker, you are instructed to disregard the third and fourth sentences of the last paragraph of the appraisal report of Gary V. Parker which is Plaintiffs Exhibit 9. As Mr. Parker testified he was told by the City of Wilmington to assume as legal conclusions the information in these

sentences and made no independent analysis of his own. My instruction to you regarding riparian rights is in direct conflict to the statements made by Mr. Parker in these sentences.

> You are instructed to disregard the last sentence of the section entitled "Ownership" on page 9 of the appraisal report of Mr. Parker which once again is exhibit 9—Plaintiffs Exhibit 9.

In addition, the Parker appraisal stated that: "[t]he property is presently owned by Seibert Associates and has been under this ownership for at least the past twenty years. It has been offered for sale or lease for several years but with no reported bona fide offers." The Superior Court instructed the commissioners to ignore the language in the appraisal which related to the absence of purchase offers.

The City contends that these instructions constitute an impermissible and highly prejudicial comment upon the evidence contrary to the constitutional prohibition against judicial comment. *See,* Del. Const. Art. IV, § 19; *Wright v. State*, Del.Supr., 405 A.2d 685, 689 (1979). According to the City, the validity of an expert's assumptions go to the weight and credibility of the expert's opinion, not its admissibility and, therefore, the validity of the assumptions underlying the Parker appraisal were within the exclusive province of the commissioners. It is argued that the Superior Court effectively instructed the commissioners that the Parker appraisal was worthless and not entitled to any weight thereby prejudicing the City's right to present evidence in support of its valuation position. In addition, it is further argued that since it had already been established during Parker's testimony that his assumption of City ownership of the submerged land, was factually incorrect, it was unnecessary to further instruct the commission-

---

**6.** *Accord Colberg, Inc. v. State*, 67 Cal.2d 408, 62 Cal.Rptr. 401, 432 P.2d 3, 11 (1967) ("when the [act of the State] is done, if it does not embrace the actual *taking* of the property, but results merely in some injurious effect upon the property, the property owner must, for the sake of the general welfare, yield uncompensated obedience") (emphasis supplied); *Kennebunk, Kenne-* *bunkport and Wells Water Dist. v. Maine Turnpike Authority*, 145 Me. 35, 71 A.2d 520, 528 (1950) ("the *taking* and diminution of the rights of the ... riparian proprietors [by the State] is the *taking* of private property for a public use, ... and this can be accomplished only ... when fair compensation is paid therefor") (emphasis supplied).

ers to disregard those portions of the Parker appraisal which indulged that assumption.

█ At the outset, we note that the admissibility of evidence is determined by the trial court as a matter of law, D.R.E. 104, and except where such rulings are discretion based, the standard of appellate review for questions of law is *de novo. Rohner v. Niemann,* Del.Supr., 380 A.2d 549, 552 (1977). In this case, once the Superior Court determined that portions of the Parker appraisal were inadmissible as a matter of law, it was required to communicate that determination to the factfinder. Although one acceptable option would be to redact the objectionable portions of the Parker appraisal report prior to submission to the commissioners, the Superior Court elected to instruct the commissioners that certain portions of the Parker appraisal should not be considered. Either approach is permissible depending upon the trial setting in which the evidence is tendered and the practicality of redaction. Regardless of the method employed to communicate that determination, the court was required to advise the commissioners of the restrictions its ruling had placed upon the appraisal report admitted into evidence. The method here employed therefore did not run afoul of the constitutional restriction against comment on the evidence. Del. Const. Art. IV, § 19; D.R.E. 104(a).

█ As an expert, Parker was entitled to rely upon facts of the kind reasonably relied upon by appraisers in formulating a valuation opinion. D.R.E. 703. However, legally incorrect assumptions concerning the ownership of condemned property certainly are not "facts" upon which experts are entitled to rely when forming an opinion concerning the fair market value of property. *Id.* An appraisal based upon legally invalid assumptions is not only irrelevant to the valuation process, it may, as here, prejudice the interests of the property owner by casting doubt on the extent of legal ownership of the condemned property, *i.e.,* that Seibert lacked rights relating to the use of the submerged land.

█ Similarly, it was objectional for the Parker appraisal report to recite that the Seibert property had been offered for sale or lease for several years with no bona fide offer. The absence of offers to purchase is not relevant to the determination of fair market value of property in eminent domain proceedings. *See State ex rel. Price v. Parcel No. 1–1.6401 Acres of Land,* Del. Supr., 243 A.2d 709, 711 (1968); *Marposon v. State,* 259 Ind. 426, 287 N.E.2d 857, 858 (1972). The Superior Court was therefore manifestly correct in instructing the jury to disregard Parker's reference to the absence of offers.

\* \* \*

The decision of the Superior Court is Affirmed in part, Reversed in part and Remanded for further proceedings consistent with this opinion.