SIERRA CLUB CITIZENS COALITION, INC., Southern New Castle County Alliance, Inc., Appellants Below, Appellants and Cross–Appellees,

v.

TIDEWATER ENVIRONMENTAL SERVICES, INC., Appellee Below, Appellee and Cross–Appellant,

v.

Delaware Department of Natural Resources and Environmental Control, Appellee Below, Appellee and Cross–Appellee.

No. 634, 2011.

Supreme Court of Delaware.

Submitted: May 16, 2012.
Decided: Aug. 16, 2012.
Corrected: Aug. 17, 2012.

Kenneth T. Kristl, Widener Environmental and Natural Resources Law Clinic, Wilmington Delaware for appellants.

Jeremy W. Homer, Parkowski, Guerke & Swayze, P.A., Dover, Delaware for appellee, Tidewater Environmental Services, Inc.

Robert F. Phillips, Department of Justice, Wilmington, Delaware for appellee Delaware Department of Natural Resources and Environmental Control.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices constituting the Court en Banc.

STEELE, Chief Justice:

A private company applied to build a wastewater treatment facility that would occupy many acres within the area protected by the Coastal Zone Act ("CZA"). The application proceeded through multiple layers of review, and now this Court must decide where this facility fits within the CZA's classification scheme, how to enforce the regulations governing "offsets" when the facility constitutes its own offset and the permit contains conditions, and the legal status of an order from the Coastal Zone Industrial Control Board that a majority of members agreed to, but less than a majority signed. We remand the case to the Board, with instructions that the facility at issue is neither a "heavy industry" use nor a "manufacturing" use, and that the Board should take care to follow the statutory requirement that all members of a quorum of a Board sign any order on which they voted.

## FACTS

Tidewater Environmental Services, Inc. ("TESI") hopes to build and operate a sewage treatment facility designed to treat domestic sewage. The proposed facility will cover 320 acres, 272 of which fall within Delaware's coastal zone. But, the two buildings where the facility treats wastewater will cover less than 20 acres, and the facility will include no treatment lagoons.

TESI filed an application with the Secretary of the Delaware Department of Natural Resources and Environmental Control for permission to build the facility.[1] The CZA establishes two layers of review before any party can appeal a decision on a permit application to the Superior Court. First, the CZA requires DNREC's Secretary to review the application.[2] After holding a public hearing, the Secretary must then "determine whether the proposed use is, according to this chapter and regulations issued pursuant thereto: a. A heavy industry use under § 7003 of this title; b. A use allowable only by permit under § 7004 of this title; or c. A use requiring no action under this

---

1. 7 *Del. C.* § 7005(a) ("All requests for permits for manufacturing land uses and for the expansion or extension of nonconforming uses as herein defined in the coastal zone shall be directed to the Secretary of the Department of Natural Resources and Environmental Control.").

2. *Id.*

chapter."[3] The Secretary next decides whether to issue the permit, guided by the factors listed in 7 *Del. C.* § 7004. An aggrieved party may appeal the Secretary's decision to the Coastal Zone Industrial Control Board, a Board which bears no obligation to defer to any of the Secretary's findings.[4] The Superior Court, in turn, reviews the Board's decision if an aggrieved party appeals.[5] Should the case be appealed to the Superior Court, the CZA confines the inquiry to the question of whether the Board abused its discretion in applying relevant statutory or regulatory authority.[6]

When TESI filed its application, several environmental groups opposed the construction of the facility, including the Sierra Club, Citizens Coalition, Inc., and Southern New Castle County Alliance, Inc.[7] DNREC's Secretary initiated a lengthy process before making a decision. The Secretary prepared and issued an Environmental Assessment Report, finding that the proposed facility would function as its own offset[8] under the CZA regulations. DNREC then announced a public hearing, and a Hearing Officer issued a report recommending that DNREC issue the permit. DNREC technical staff also issued a Technical Response Memorandum analyzing the proposed project. After reviewing these materials, the Secretary issued an Order granting a permit for the project. The Secretary justified the permit on the basis that the proposed facility would prevent the installation of thousands of septic systems. Both the environmental groups and TESI appealed the Secretary's decision to the Board.

The Board first found that the proposed facility does not qualify as a heavy industry use because the treatment facility will occupy less than 20 acres, and because the ban on heavy industry was intended to apply to facilities such as oil refineries. The Board determined that the facility does not count as a manufacturing use because it will offer no products for sale. Nevertheless, the Board found that under 7 Del. Admin. C. § 6.2, the facility can only be built with a permit. That provision imposes a permit requirement on "[a]ny recycling plant or sewage treatment plant not excluded by Section E(20) of the Regulations."[9] The Board then granted the permit because it agreed with the Secretary that the proposed facility would provide environmental benefits. The Board also found that the facility constituted its own offset, and that the Secretary's failure to comply with 7 Del. Admin. C. §§ 9.3.1 and 9.1.6 did not compel the Board to refuse to authorize the permit.[10]

---

3. *Id.*

4. 7 *Del. C.* § 7007.

5. 7 *Del. C.* § 7008.

6. *Id.*

7. We refer to this group by referencing the first party named in the caption, Sierra Club.

8. 7 Del. Admin. C. § 101–9.1.1 ("Any application for a Coastal Zone permit for an activity or facility that will result in any negative environmental impact shall contain an offset proposal. Offset proposals must more than offset the negative environmental impacts associated with the proposed project or activity requiring a permit.").

9. 7 Del. Admin. C. § 101–6.2.

10. 7 Del. Admin. C. § 101–9.3.1 ("Coastal Zone permits shall be approved contingent upon the applicant carrying out the proposed offset in accordance with an agreed upon schedule for completion of the offset project. Said schedule will be included in the Coastal Zone permit as an enforceable condition of the permit."); 7 *Del. Admin. Code* 101–9.1.6 ("Where an offset project in itself requires one or more permits from a program or programs within DNREC, the Secretary shall issue the Coastal Zone permit only after all

Five members of the Board reached apparent agreement concerning this outcome, as illustrated by a vote held during a public meeting. But, only four Board members signed the written order that eventually explained these conclusions.

On appeal to the Superior Court, the Sierra Club argued that the proposed facility should be considered a heavy industry use, that the presence of only four signatures meant the Superior Court judge should consider the Board's order a legal nullity, and that the Board's order violated CZA regulations concerning offsets. The Superior Court judge deemed the proposed facility a manufacturing use, but refused to find any material legal defect in issuing the permit, concluding that the Board violated the offset regulations, but that it did not matter. Finally, the Superior Court judge held that all five members of the Board were not required to sign the Order.

The Sierra Club appealed to this Court, suggesting that the missing signature rendered the Board's decision a nullity and that the Superior Court judge erred: (i) by giving the decision some deference, (ii) by holding that violations of the CZA regulations did not require revocation of the permit's issuance, and (iii) by refusing to classify the facility as a heavy industry use.

TESI filed a cross appeal. In addition to responding to Sierra Club's arguments, TESI suggested that the administrative regulations cannot validly impose a permit requirement on a facility that does not fit within the CZA's definition of a manufacturing use.

### STANDARD OF REVIEW

■ This Court reviews the interpretation of statutory provisions and administrative regulations using a *de novo* standard.[11]

### DISCUSSION

■ Under the Coastal Zone Act, the proposed facility does not fit within the category of "heavy industry" use or "manufacturing" use. The CZA places proposed projects in two categories. If a project would constitute a heavy industry use, then § 7003 prohibits it.[12] If a project would constitute a manufacturing use, then § 7004 permits it "by permit only." This proposed facility fits into neither category.

The definition of "heavy industry use" includes descriptions of characteristics of projects that would count as heavy industry use, and then provides examples of those kinds of facilities.[13] This proposed

applicable permit applications for offsetting projects have been received and deemed administratively complete by DNREC.").

11. *Oceanport Industries, Inc. v. Wilmington Stevedores, Inc.* 636 A.2d 892, 899 (Del.1994).

12. 7 *Del. C.* § 7003 ("Heavy industry uses of any kind not in operation on June 28, 1971, are prohibited in the coastal zone and no permits may be issued therefor.").

13. 7 *Del. C.* § 7002(e) (" 'Heavy industry use' means a use characteristically involving more than 20 acres, and characteristically employing some but not necessarily all of such equipment such as, but not limited to, smokestacks,

tanks, distillation or reaction columns, chemical processing equipment, scrubbing towers, pickling equipment and waste-treatment lagoons; which industry, although conceivably operable without polluting the environment, has the potential to pollute when equipment malfunctions or human error occurs. Examples of heavy industry are oil refineries, basic steel manufacturing plants, basic cellulosic pulp-paper mills, and chemical plants such as petrochemical complexes.... Generic examples of uses not included in the definition of 'heavy industry' are such uses as garment factories, automobile assembly plants and jewelry and leather goods manufacturing establishments, and on-shore facilities, less than

facility does not exhibit many of the characteristics, and does not resemble the examples. Most importantly, the portion of the facility that will treat wastewater—consisting of only two buildings—covers less than 20 acres. Further, the CZA mentions that heavy industry use projects will "employ[ ] some but not necessarily all of such equipment such as, but not limited to, smokestacks, tanks, distillation or reaction columns, chemical processing equipment, scrubbing towers, pickling equipment and waste-treatment lagoons...."[14] This facility includes a couple of those types of equipment, but does not come close to including all of them, and notably will not include waste treatment lagoons. Furthermore, all the examples provided in § 7002(e)—"heavy oil refineries, basic steel manufacturing plants, basic cellulosic pulp-paper mills, and chemical plants such as petrochemical complexes"—pose a greater threat to the environment than does a wastewater treatment facility.

It is true, however, that a wastewater treatment facility will include tanks, and has the potential to pollute if something malfunctions. But a facility does not become a heavy industry use merely because it meets part of the definition. The Act's definition of heavy industry use, however, suggests that unless a proposed plan has most of the listed characteristics, it will probably not fit the definition of heavy industry use. The phrase "some but not necessarily all" suggests that unless the facility includes almost all of the listed characteristics, or closely resembles the provided paradigmatic examples, it will not satisfy the definition of heavy industry use. Neither the Secretary, nor the Board, nor

the Superior Court, found otherwise. We likewise refuse to find that those three decision making bodies erred as a matter of law or abused their discretion.

The Sierra Club contends that § 7003 takes care to exclude *public* sewage treatment plants from the definition of heavy industry use. The Sierra Club suggests that because the statutory drafters excluded *public* facilities, we should infer that without the exclusion, those plants would fit in the definition of heavy use. Sierra Club argues that since public facilities fit the definition, a private treatment facility must likewise count as heavy industry use.

This argument fails because it depends on the assumption that the Act's exclusion of "public wastewater treatment facilities," without qualification, means that the definition of heavy industry use covers all wastewater treatment facilities without regard to any particular facts about them. That is not correct. The exclusion means only that no public wastewater treatment facility will be considered a heavy industry use, even if the characteristics of that particular project otherwise fit the definition.

Finally, the Sierra Club suggests that the potential to pollute is "the core requirement" of § 7002(e)'s definition of heavy industry. That argument oversimplifies the definition. Of course any proposed facility must have the potential to pollute to be considered a heavy industry use. Section 7002(e) defines "heavy industry use" as, in part, a use that "has the potential to pollute when equipment malfunctions or human error occurs." But the definition neither ends nor begins with

20 acres in size, consisting of warehouses, equipment repair and maintenance structures, open storage areas, office and communication buildings, helipads, parking space and other service or supply structures required for the transfer of materials and work-

ers in support of off-shore research, exploration and development operations; provided, however, that on-shore facilities shall not include tank farms or storage tanks.").

**14.** 7 *Del. C.* § 7002(e).

that requirement. If all facilities with the potential to pollute were considered a heavy industry use, then § 7002(e) would not exclude leather and automobile factories, and the entire separate category of "manufacturing use" need not exist, as all these types of uses have the potential to pollute.

■ Nor can the proposed facility be considered a manufacturing use, because it will not create any product. Under § 7002(d), "manufacturing means the mechanical or chemical transformation of organic or inorganic substances into new products...." A "product" is "something that is distributed commercially for use or consumption and that is usu[ally] (1) tangible personal property, (2) the result of fabrication or processing, and (3) an item that has passed through a chain of commercial distribution before ultimate use or consumption."[15] A wastewater treatment facility does not create items for sale; it releases treated water. DNREC proves as much by arguing that if the economics change, a wastewater plant could begin selling water. We decline to classify this facility as a manufacturing use because it is logically possible that at some future point the treated water could possibly be sold.

DNREC points to *City of Wilmington v. Parcel of Land*[16] to suggest that wastewater treatment should count as a manufacturing use. In *City of Wilmington*, this Court held that the Superior Court erred by deciding that the CZA had no effect on the valuation of condemned property. The property owner's expert testified that fluorspar tailings on the condemned property added to the value because the material could be refined, onsite, into saleable grade fluorspar. The Superior Court judge instructed commissioners that producing saleable fluorspar would not constitute either a heavy industry use or a manufacturing use under the CZA, and this Court found that instruction constituted error.[17] The property owner argued to us that the production of fluorspar from fluorspar ore did not count as a transformation into a new product, because the process begins and ends with fluorspar.[18] This Court rejected that argument, observing that the proposed refining "is a mechanical and chemical transformation of an inorganic substance (fluorspar tailings) into a new product (saleable grade fluorspar) ...."[19] The proposed wastewater treatment facility, by contrast, will not create a product.

On remand, the Board should consider whether an administrative regulation can impose a permit requirement when the CZA does not. By noting that currently existing regulations require the facility to hold a permit, we do not comment on the permissibility of those regulations. TESI presented this issue to us via cross appeal, but we decline to resolve it without the benefit of the Superior Court's opinion on the issue. The Superior Court judge decided that the facility counted as a manufacturing use, and therefore, did not reach this issue.[20]

■ The Sierra Club also objects to the issuance of the permit because TESI failed to file some permitting documents.

15. BLACK'S LAW DICTIONARY 1245 (8th ed. 2004).

16. 607 A.2d 1163 (Del.1992).

17. *Id.* at 1165.

18. *Id.* at 1166.

19. *Id.* at 1167.

20. *Sierra Club v. Tidewater Env. Servs., Inc.,* 2011 WL 5822636, at *16 (Del.Super. Oct. 27, 2011).

As the Superior Court judge found, "The CZA permit was issued despite TESI's failure to file a construction permit application and its failure to file an offset schedule ....."[21] The relevant regulatory scheme, 7 Del. Admin. C. §§ 9.1—9.3, applies to any "activity or facility that will result in any negative environmental impact,"[22] and requires developers to meticulously document their plans to build the offset, to ensure that developers will build the promised offset.[23] The prototypical offset, as envisioned by these regulations, is a project separate from the approved use, that will do something positive for the environment, so as to mitigate harm caused by the approved use. The Superior Court judge stated that "The Facility is, by all accounts, a unique project in that the Facility serves as its own offset."[24] That language means that the facility will, on balance, provide a net benefit to the environment. But it also means that DNREC has a basis to believe that TESI cannot build the permitted facility without simultaneously building the offset. When TESI builds the facility, it will at the same time build the offset. Moreover, the Board imposed conditions upon issuance of the permit, meaning that TESI's permit "is conditional upon the submission of the construction permit application."[25] Furthermore, "DNREC has a number of tools at its disposal should TESI fail to comply with the permit conditions."[26] Given these circumstances, the Board's decision to issue the permit even though TESI had not submitted all documents required under the Regulations does not constitute an abuse of discretion.

Finally, the Sierra Club suggests that the Superior Court erred by giving deference to the Board's decision, even though not all five members of the nine member Board who made the decision signed the written order. Section 7007(b) requires the Board to "render its decision in the form of a final order within 60 days following receipt of the appeal notification," and § 7006 requires a majority of the total membership of the Board to "make a final decision on a permit request." Reading these provisions in harmony,[27] the Sierra Club suggests that a majority of the Board must render its decision in the form on a final order. Sierra Club contends that 'to render' means to put forward a formal written order, and therefore five members, a majority of the Board, must sign the written document containing the order. Sierra Club also finds support for its contention that at least a quorum must sign the written order in the Administrative Procedures Act, which requires that "Every final order shall be authenticated by the signatures of at least a quorum of all agency members, unless otherwise provided by law."[28] The APA does not define "quorum," therefore, we apply the commonly accepted meaning: "a majority of

---

21. *Id.* at *17.

22. 7 Del. Admin. C. § 9.1.1.

23. *See* 7 Del. Admin. C. § 9.1.6 ("Where an offset project in itself requires one or more permits from a program or programs within DNREC, the Secretary shall issue the Coastal Zone Permit only after all applicable permit applications for offsetting projects have been received and deemed administratively complete by DNREC.").

24. *Sierra Club,* 2011 WL 5822636, at *18.

25. *Id.* at *19.

26. *Id.* (citing 7 *Del. C.* § 7010, 7011, 7012).

27. *Coastal Barge Corp. v. Coastal Zone Industrial Control Board,* 492 A.2d 1242, 1245 (Del. 1985) ("[E]ach part or section should be read in light of every other part or section to produce a harmonious whole.").

28. 29 *Del. C.* § 10128(c).

those members required to take action." Here, a majority of five took oral action, but only four—less than a quorum—signed the formal Order.

Oddly, no party disputes that this Order resulted from the publically announced agreement of five members (a majority) of the Board, and that the written Order bore only four signatures.

As a practical matter, the Board can and should avoid this problem on remand.

### CONCLUSION

We remand this case to the Coastal Zone Industrial Control Board for action consistent with this Opinion. Jurisdiction is not retained.