CHRYSLER CORPORATION, (DELA-WARE), Defendant Below, Appellant, Cross–Appellee,

v.

CHAPLAKE HOLDINGS, LTD., Portman Lamborghini, Ltd. (In Receivership), and David T. Lakeman, Plaintiffs Below, Appellees, Cross–Appellants.

No. 63,2002, 65,2002.

Supreme Court of Delaware.

Submitted: Dec. 12, 2002.
Decided: May 9, 2003.
Reargument/Rehearing En Banc
Denied May 27, 2003.

John A. Parkins, Jr., of Richards, Layton & Finger, Wilmington; Robert D. Cultice (argued), Michael R. Heyison, G. Perry Wu, and James S. Goldman, of Hale and Dorr, LLP, Boston MA, of counsel, for Appellant, Cross–Appellee.

Laurence V. Cronin, of Smith, Katzenstein & Furlow, LLP, Wilmington; Michael J. Connolly (argued), Kelley A. Jordan–Price and Catherine S. Kim of Hinckley Allen & Snyder, LLP, Boston, MA, of counsel, for Appellees, Cross–Appellants.

Before HOLLAND and BERGER, Justices, and WALSH, Justice (Retired).[1]

WALSH, Justice (Retired).

This is an appeal from a jury award of damages in the Superior Court arising from a failed enterprise for the sale and distribution of Lamborghini automobiles in the United Kingdom. The appellant, defendant-below, contends the Superior Court erred in permitting recovery on the theory of promissory estoppel. The appellee has cross-appealed from rulings disallowing a claim for negligent misrepresentation and refusing an award of prejudgment interest. We find no error in the direct appeal and accordingly affirm the judgment and award of damages. We further conclude that the appellant is entitled to pre-judgment interest and reverse and remand as to that claim.

## I.

In 1984, David Jolliffe ("Jolliffe") and David Lakeman ("Lakeman") formed Chaplake Holdings, Ltd. ("Chaplake") as equal shareholders.[2] Chaplake owned Vehiclise, Ltd. ("Vehiclise") and Lamborghini London, Ltd. ("Lamborghini London"). In 1990, Lamborghini London transferred all of its assets and liabilities to Portman Lamborghini, Ltd. ("Portman"), which was also owned by Chaplake.[3]

Vehiclise held an exclusive concession contract, dating back to 1984, with Automobili Feruccio Lamborghini, S.p.A. ("Lamborghini") to sell ultra-high end Lamborghini sports cars to consumers in the United Kingdom, Ireland and the Channel Islands. Portman operated an automobile dealership with rights to the Vehiclise concession agreement. Between

1. Sitting by designation pursuant to Del. Const. art. IV, § 38 and 29 *Del. C.* § 5610.

2. Chaplake was a United Kingdom company.

3. For convenience, the Appellants in this case—Chaplake, Portman, and Lakeman, individually—will be collectively referred to as Portman unless the difference is germane to the discussion.

1984 and 1987, Portman sold approximately thirty new Lamborghinis each year, making it the largest Lamborghini dealer in the world. At this time, Lamborghini's average production was only 250 cars per year.

In 1987, Chrysler International, a wholly owned subsidiary of Chrysler Corporation (collectively, "Chrysler"), purchased all outstanding shares of Lamborghini and articulated plans to escalate production from 250 to roughly 5,000 units within five years (the "Expansion Plan"). The Expansion Plan included the production of a new model called the P140, intended as a high volume alternative to the Lamborghini Countach, and its successor model, the Diablo. Chrysler planned to continue production of the Diablo at a volume of approximately 500 per year with a retail price between $200,000 and $300,000. The vision for the P140 was to reach a broader segment of the population by initially producing roughly 2,500 cars per year and by attaching a more "modest" retail price tag of approximately $70,000.

Chrysler had absolute control of the Lamborghini Expansion Plan. Chrysler defined the duties of Lamborghini's president, and it placed two of its top executives on Lamborghini's board. One of these individuals, Anthony Richards ("Richards"), acknowledged that Chrysler's then-Chairman, Lee Iacocca ("Iacocca"), had significant and direct input concerning Lamborghini. Indeed, at the time of Chrysler's acquisition of Lamborghini, Iacocca stated that Chrysler purchased the sports car manufacturer with the intention of expanding its production.[4] The other Chrysler executive placed at Lamborghini, Robert Smith ("Smith"), was charged with reporting Lamborghini's financial information back to Chrysler. Chrysler personnel were placed at Lamborghini and all moves relating to the Expansion Plan required Chrysler's approval.

In May of 1987, Emile Novaro ("Novaro"), the President of Lamborghini, discussed the Expansion Plan with Jolliffe. Novaro was concerned that Portman, which at that point had been handling only about 30 cars per year, would be unable to accommodate the 300 Lamborghinis destined for its exclusive market once the Expansion Plan was implemented. Nevertheless, Novaro assured Jolliffe that Portman's exclusive concession deal with Lamborghini would remain intact as long as Portman expanded its dealership capacity to handle the influx of 270 additional cars per year. Jolliffe agreed to meet with his partner, Lakeman, to determine the feasibility of expanding Portman.

Novaro was injured in an automobile accident in July of 1987, and Richards assumed the role of President of Lamborghini until Novaro was able to return. Shortly thereafter, Richards met with Jolliffe at Lamborghini's factory and reiterated Novaro's promise that Portman would retain its hold on the United Kingdom market if it expanded along with Lamborghini.

---

4. As Iacocca told an industry newspaper in May 1987, "[Chrysler] can go to 500 for openers and later on with some expansion go to 1,000. That's a lot. The market for $100,000 cars gets rather slim. We certainly wouldn't stay at 250 or we wouldn't have bought it. We'll expand [Lamborghini]. I don't know how long that will take." In that same article, Robert Lutz, a Chrysler Executive Vice President, who was responsible for international operations stated that "[Chrysler is] better off with a few highly qualified [dealers] who know how to sell and service [Lamborghinis] and have access to that type of customer." Lutz also reported Chrysler's plans to expand production to 5,000 within 5 years, and reported that "[i]f and when we get to 3,000 a year" then Chrysler might consider expanding its existing dealer network.

Jolliffe and Lakeman worked with bankers from Credit Suisse and with the accounting firm of Buzzacott & Co. to develop a feasibility and future business plan (collectively, the "Portman Plan"). The Portman Plan was based on figures provided by Novaro at the May 1987 meeting. It included a progressive increase in shipments from 35 cars in 1987 to 400 cars in 1992, and also factored in Portman's exclusive worldwide rights to sales of right hand drive Lamborghinis.[5] The Plan also called for tripling the staff at Portman, the construction of new showrooms in Birmingham, Bristol, Manchester, and Glasgow, the purchase of computer equipment and software, and the acquisition and development of real property for a new headquarters. With these capital improvements, Portman was positioned to handle the requisite ten percent of Lamborghini's prospective output, thus allowing it to maintain exclusivity.

In the Fall of 1987, Chrysler assigned Carl Levy ("Levy") as Vice President of Lamborghini. Richards described Levy as President *Pro Tem* of Lamborghini, and Levy told Lakeman that his job was to implement the Expansion Plan. Levy met with Jolliffe, Lakeman, and George Burkhardt ("Burkhardt"), the head of Credit Suisse's London office, and Levy confirmed the details of the Expansion Plan and expressed his satisfaction that Portman was moving forward with its Plan in order to manage the increased volume.

In September 1988, Iacocca spoke to a gathering of Lamborghini dealers and confirmed the Expansion Plan, but extended the time period from five years to six years. Accordingly, Portman and Credit Suisse altered the Portman Plan to compensate for the delay. When Richards introduced Jolliffe to Iacocca, Jolliffe confirmed that Portman, and thus the United Kingdom market, was "on-board" with the Expansion Plan.

Credit Suisse extended Portman an increase in its overdraft facility to pay for the Portman Plan. Lakeman was required to provide a cash guaranty in the amount of £448,568.62 in order to secure the increased overdraft facility. Credit Suisse also requested that Portman hire Howard Mitchinson ("Mitchinson") as an accountant. Once on board, Mitchinson met with representatives from Lamborghini, including Novaro. They confirmed the details of the Expansion Plan.

In 1989, Chrysler hired Dario Molaschi ("Molaschi") to act as a representative to European dealers to assist the dealers in preparation for sales of the Lamborghini P140 model. In early 1990, Molaschi visited Portman and confirmed that the Portman Plan was consistent with the Expansion Plan. By this time, Portman had acquired the financing necessary for its Plan, hired additional staff, acquired facilities at a site called Brooklands, and built a new distribution center.

Chrysler's internal documents also reflect its commitment to Portman. The documents demonstrate that the expected introduction of the P140 in 1991 would lead to the development of new dealers in every major European country except the United Kingdom and Ireland where Portman would remain as the exclusive dealer until at least 1993.

In January of 1990, Jolliffe and Lakeman met with Novaro to set allocation for

**5.** Right hand drive models have the steering wheel on the right hand side of the driver's compartment and are manufactured as such at the factory, not retrofitted at a later date. No less than sixty countries in the world drive on the left side of the road and require right hand drive models. These countries include not only the United Kingdom, Ireland and the Channel Islands, but also Japan and Australia.

the Diablo model for the years 1990 through 1993. The parties did not, however, make any agreement regarding the P140. An economic downturn in the United States soured Chrysler's outlook on the Lamborghini P140. Production and development stalled and Chrysler lost confidence in the project. Ultimately, Chrysler spent only about one-third of what it expected to invest in development of the P140.[6]

During a visit by Portman representatives to the Lamborghini plant in the Fall of 1991, Novaro assured the representatives that production for both the Diablo and the P140 was on schedule. Around this time, the Lamborghini factory sent Portman a prototype P140 for use in government crash tests. By August of 1991, Portman had spent £569,321[7] on its Plan. Also in 1991, Jolliffe sold sixty-percent of his interest in Chaplake to Sheik Mohammed Fahkry ("Fahkry") for £500,000. Jolliffe proceeded to re-invest £462,686.47 of those funds into Chaplake. In turn, Chaplake loaned the money to Portman.

The delays in production at Lamborghini eventually eroded Portman's profitability and success. Between June 1990 and June 1991, Lamborghini sent Portman no right-hand drive Diablos, nor any P140s. Lamborghini shipped four left-hand drive Diablos, but these units were of little use to Portman whose clientele almost exclusively demanded right-hand drive models.

As a result of the delays, Portman's customers became impatient and demanded refunds on their deposits. Because of its loss of income, however, Portman was unable to repay the deposits. Lamborghini was also unwilling to refund the deposits that Portman had paid to the manufacturer because Chrysler used that money to pay for the Expansion Plan. Additionally, Portman was unable to service its debt to Credit Suisse, which the bank eventually called in March of 1992. At that time, the amount owed totaled £2,105,183.62.

Because Portman was unable to repay its debt, Credit Suisse invoked Lakeman's guarantee of £448,568.62. When Lamborghini finally shipped the long awaited Diablos to Portman, the dealership was in an irretrievable state and it finally entered receivership in April of 1992.

In 1994, Chaplake, Portman (then in receivership) and Lakeman brought suit against Chrysler, in the Superior Court seeking recovery for damages sustained by each of them for alleged breach of implied contract and fraud. In separate rulings in 1999, the Superior Court denied Chrysler's motion for summary judgment on the breach of contract and fraud claims but permitted the Plaintiffs to add claims of negligent misrepresentation and promissory estoppel.

In June, 2001 the matter proceeded to trial before a jury. Through a special verdict that jury found that Chrysler was liable under the doctrine of promissory estoppel, but not liable for fraud, negligent misrepresentation or breach of implied contract. Based on this finding, the jury awarded £569,321.45 to Portman for costs it incurred in implementing the Portman Plan. It also awarded £462,686.47 to Chaplake in compensation for the amount Chap-

---

**6.** In fact, as early as 1989, Chrysler began to contemplate an exit strategy from the Expansion Plan, including either ceasing development of the P140 or selling Lamborghini outright. Toward that end, Chrysler engaged J.P. Morgan to canvass the "universe" of parties with potential interest in an acquisition of Lamborghini. Those efforts bore no fruit, however, and thus Chrysler opted instead to cease funding for the Expansion Plan.

**7.** The source of this funding was loans from Credit Suisse and Barclay's Bank.

lake invested in Portman to fund expansion.

## II

In this appeal, Chrysler argues that: (i) the trial court erred in submitting Portman's promissory estoppel claim to the jury; (ii) the trial court erred by ruling that Chrysler's statute of frauds defense was precluded as a matter of law by the doctrine of part performance; (iii) that Portman and Chaplake failed as a matter of law to establish the promissory estoppel claims; (iv) Portman failed to establish proof of agency between those purportedly making the promises and Chrysler; and (v) Portman's promissory estoppel claims were barred by the statute of limitations.

In its cross-appeal, Portman argues that: (i) the trial court erred in not granting a new trial on Portman's negligent misrepresentation claim; and (ii) the trial court erred in its failure to award prejudgment interest to Portman. We address the myriad arguments advanced by the parties.

### A.

█ Chrysler argues that the Superior Court erred in submitting Portman's promissory estoppel claim to the jury because Portman's primary theory of recovery was based upon the purported existence of an enforceable contract, an antithetical concept. We review issues of law *de novo*. *City of Wilmington v. Parcel of Land*, 607 A.2d 1163, 1166 (Del.1992) (citation omitted). It is the province of the trial court to determine whether, as a matter of law, sufficient evidence exists to submit an issue to the jury. *Feliciano v. State*, 332 A.2d 148, 150 (Del.1975).

█ In effect, Chrysler questions the propriety of Plaintiffs' pleading in the alternative. Superior Court Civil Rule 8(e)(2) provides in the pertinent part:

A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. When 2 or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as he has regardless of consistency.

Here, Portman set forth distinct claims based upon contract principles and upon the doctrine of promissory estoppel. Both theories were submitted to the jury. The jury found for Chrysler on the contract claims, and in favor of Portman and Chaplake on promissory estoppel. This is a logical outcome given that the doctrine of promissory estoppel is properly understood as a consideration substitute in cases where a contract has not been formed. *See Lord v. Souder*, 748 A.2d 393, 400 (Del.1999) (citing *Corbin on Contracts* § 8.12, p. 101).

The Delaware Superior Court Civil Rules expressly permit pleading in the alternative, and there was sufficient evidence to submit the promissory estoppel claim to the jury. Accordingly, the trial court did not err in submitting alternative theories of recovery to the jury.

### B.

Next, Chrysler argues that the statute of frauds should have been applied to Portman and Chaplake's promissory estoppel claims. The trial court rejected both a motion for a new trial and a motion for judgment as a matter of law on this issue, concluding that Chrysler had waived the defense. We review for an abuse of dis-

cretion the denial of a motion for a new trial. *See, e.g., Amalfitano v. Baker,* 794 A.2d 575, 577 (Del.2001). We review *de novo* the denial of the motion for judgment as a matter of law. *CitiSteel USA, Inc. v. Connell Ltd. Pshp., Luria Bros. Div.,* 758 A.2d 928, 930 (Del.2000).

■ The Superior Court rejected Chrysler's statute of frauds argument with respect to the promissory estoppel claims because Chrysler failed to submit a jury instruction thereon and failed to preserve its objection to the trial court's instructions for the record. This failure to lodge an appropriate objection results in a waiver. *Riggins v. Mauriello,* 603 A.2d 827, 830 (Del.1992); Del.Super. Ct. Civ. R. 51; Del. Supr. Ct. R. 8. Chrysler argues that it was deterred from submitting such an instruction as a matter of law by the Superior Court's ruling on a Rule 50(a) motion. The Superior Court, however, merely ruled on the statute of frauds with respect to Chrysler's contract claims.

Chrysler also argues that it referred to promissory estoppel in its proposed statute of frauds instruction for the contract claims. This passing reference to promissory estoppel is of no consequence, however, because Portman and Chaplake pleaded promissory estoppel as an affirmative cause of action. Chrysler wrongly assumes that promissory estoppel in this case was simply a defense to the statute of frauds within the context of the contract claim. Portman and Chaplake pled promissory estoppel as a separate, alternative cause of action. Chrysler failed to preserve the defense of statute of frauds as it related to the promissory estoppel claims, and as a result the defense is waived.

## C.

■ Next, Chrysler contends the Superior Court erred in denying its motion for judgment as a matter of law, arguing that Portman and Chaplake failed to establish a legally sufficient claim for promissory estoppel. "This Court reviews *de novo* the Superior Court's decision to deny [Chrysler's] ... post-trial motion for judgment as a matter of law." *CitiSteel USA,* 758 A.2d at 930. We consider the evidence, as well as all reasonable inferences that may be taken therefrom, in the light most favorable to Portman and Chaplake, in order to determine whether there were any issues of material fact for the jury to consider. *Id.*

■ Under the doctrine of promissory estoppel, a plaintiff must demonstrate by clear and convincing evidence that:

(i) a promise was made;

(ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee;

(iii) the promisee reasonably relied on the promise and took action to his detriment; and

(iv) such promise is binding because injustice can be avoided only by enforcement of the promise.

*Lord,* 748 A.2d at 399 (citation omitted).

We recently affirmed the holding and rationale of the Court of Chancery in a case raising issues similar to those presented here. *See King v. Limestone Valley Enterprises,* L.P., et al., 2002 WL 853552, 2002 Del. Ch. Lexis 47, * (Apr. 24, 2002), *aff'd sub nom Salon by Dominic, Inc. v. King,* 812 A.2d 900, 2002 Del. Lexis 721, * (Dec. 4, 2002) (hereinafter *Salon by Dominic*). In *Salon by Dominic,* a shopping center tenant relied upon oral assurances by another tenant that the latter had no objection to the opening of a day spa (the "Spa") in the center. After the plaintiff-tenant had operated the Spa for three years in apparent harmony with defendant's salon (the "Salon"), the defendant-

tenant leased additional space to operate a competing spa, as permitted by the terms of the defendant's original lease.[8] King sought injunctive relief to prevent operation of the competing business.

The Court of Chancery concluded that the plaintiff believed that the Salon would not offer day spa services, a belief not based upon the terms of the Spa's lease, but rather upon the promises made to her personally by the defendant. The Vice Chancellor applied the *Lord* test in order to determine whether, under the doctrine of promissory estoppel, the defendant was indeed bound by his self-imposed "non-compete" agreement. *Id.* at *5, 2002 Del. Lexis at *15–*16.

The court found that the defendant could have reasonably expected King to choose to locate in the shopping center based upon his assurances to her, and that she did so to her eventual detriment. *Id.* Finally, the Court of Chancery concluded that injustice would result unless the defendant's promises to plaintiff were enforced. *Id.*

■ The *Salon by Dominic* analysis finds ready application here. There were a series of promises made by Chrysler and its various representatives to Portman, Chaplake and their representatives. First, the comments of then-chairman Iacocca upon the acquisition of Lamborghini made clear Chrysler's plans to expand production over a period of five to six years. More importantly, between 1987 and 1991, Novaro, Richards, Molaschi and Levy made similar statements promising that the Lamborghini line would expand tenfold, and that Portman would retain its exclusivity deal *only* if it expanded its operational capacity. By making these

promises, Chrysler should have expected that Portman and Chaplake would be induced to expand its operations in accordance with the promised expansion of the Lamborghini line of automobiles.

Portman and Chaplake reasonably relied upon the promises made by Chrysler, and took action to their detriment. Over a period of several years, Portman and Chaplake were regularly updated regarding the progress of the Expansion Plan. Portman would not have implemented the Portman Plan in the absence of these promises. The reasonableness of Portman and Chaplake's reliance is bolstered by the fact that the promises emanated from many of the most senior officers involved with the Expansion Plan.

Lakeman and Jolliffe were sophisticated businessmen in their own right, and in crafting the Portman Plan they employed the services of highly sophisticated advisors. Nevertheless, the record establishes that *all* of the Chrysler/Lamborghini executives with whom Lakeman, Jolliffe, and their advisors came in contact provided the same message: Chrysler is committed to the Expansion Plan, and in order for Portman to retain its exclusivity in the U.K. market, it must expand its operational capacity accordingly. Therefore, it was not unreasonable for Lakeman and Jolliffe to rely upon the promises made by these executives.

Chrysler also argues that the existing written contracts between the parties governed the relationship, and therefore promissory estoppel is inapplicable. Here, Portman and Chaplake relied on promises from Chrysler executives. Those promises induced them to increase operational ca-

---

**8.** After the Spa opened, plaintiff and her landlord executed an addendum to her lease that gave the Spa exclusive rights in the shopping center to certain types of day spa services. The terms in the addendum, however, did not apply to existing tenants, including defendant. *King,* 2002 WL 853552, at *2, 2002 Del. Ch. Lexis 47 at *4–*5.

pacity and investment to a degree that would have been unnecessary *but for* the Expansion Plan and the role they were promised therein. The contracts governing other aspects of the business relationship are of no consequence to this analysis because the promises made regarding Portman's role in the Expansion Plan were in addition to the existing relationship. Finally, Chrysler correctly points out that the trial court failed to address the fourth element—or the so-called "avoidance of injustice" element—of the *Lord* test. The trial court concluded, and Portman agrees, that this fourth element is applicable only in at-will employment disputes. We disagree.

■■■■ We review *de novo* the trial court's decision to issue a challenged jury instruction. *Corbitt v. Tatagari,* 804 A.2d 1057, 1062 (Del.2002) (citation omitted). In so considering, we do not seek a set of particular words for any given instruction, rather it is enough that the law is correctly stated in the instruction and that the jury will be able to serve its function and duty. *Id.* We do not recognize a right to an instruction worded in a particular way. *Id.* Indeed, jury "instructions need not be perfect" they must rather "give a correct statement of the substance of the law and be 'reasonably informative and not misleading' " when read as a whole. *Id.* (quoting *Cabrera v. State,* 747 A.2d 543, 544 (Del.2000)).

■■■ The *Lord* standard applies to all promissory estoppel claims, not merely those cases dealing with employment matters. In its instructions to the jury, the Superior Court omitted the fourth *Lord* element: that the "promise is binding because injustice can be avoided only by

enforcement of the promise." *Lord,* 748 A.2d at 399. The avoidance of injustice element is, however, a legal concept and not a question of fact to be submitted to the jury. *See, e.g., Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 133 N.W.2d 267, 275 (1965) (holding that the injustice element of a promissory estoppel case is a matter of policy and a question of law); *Tour Costa Rica v. Country Walkers,* 171 Vt. 116, 758 A.2d 795, 801 (2000) ("[w]hether injustice can be avoided only by enforcement of the promise is a question of law"); *Cohen v. Cowles Media Co.,* 479 N.W.2d 387, 391 (Minn.1992) (holding that the determination of injustice in a promissory estoppel case "is a legal question for the court, as it involves a policy decision"); and *D & S Coal Co., Inc. v. USX Corp.,* 678 F.Supp. 1318, 1320–1321 (E.D.Tenn. 1988) ("The injustice requirement of promissory estoppel is an equitable consideration which must ultimately be determined by the court, not the jury.").

The prevention of injustice is the "fundamental idea" underlying the doctrine of promissory estoppel. *See Chrysler v. Quimby,* 144 A.2d 123, 133 (Del.1958). Accordingly, the trial judge implicitly found that this element was satisfied, and the court did not err by failing to submit this element of the *Lord* test to the jury.[9]

### D.

■■■■ Chrysler also appeals the Superior Court's denial of a motion for judgment as a matter of law, arguing that Portman's proof of agency was legally insufficient. This Court reviews the Superior Court's denial of the motion for a judgment as a matter of law to determine

---

**9.** Chrysler also argues that Chaplake was not a real party in interest because any relief to which Chaplake is entitled should have been sought as a creditor within the context of

Portman's receivership. We agree with the trial judge, however, and adopt his analysis on that issue.

"whether the evidence and all reasonable inferences that can be drawn therefrom, taken in a light most favorable to the non-moving party, raise an issue of material fact for consideration by the jury." *Mazda Motor Corp. v. Lindahl,* 706 A.2d 526, 530 (Del.1998) (quoting *Farm Family Mutual Ins. Co. v. Perdue, Inc.,* 608 A.2d 726 (Del.1992)). Deference is appropriate unless, "under any reasonable view of the evidence the jury could have justifiably found for [the non-moving party]." *Id.* (quoting *Parks v. Ziegler,* 221 A.2d 510, 511 (Del.1966)).

 In the parent-subsidiary context, it is appropriate to consider the extent of control exercised by the parent over the subsidiary in order to determine the scope of the agency relationship. *J.E. Rhoads & Sons, Inc. v. Ammerall, Inc.,* 1988 Del.Super. LEXIS 116, *11–12 (March 30, 1988). "Under the agency theory, the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 560 (D.Del.1998). "When applying an agency theory, the Court should focus its inquiry on the arrangement between the corporations, the authority given in the arrangement, and the relevance of that arrangement to the Plaintiffs' claim." *Eisenmann Corp v. General Motors,* 2000 WL 140781 at *12, 2000 Del.Super. Lexis 25, *39–*40 (Jan. 28, 2000) (citation omitted).

 In this case, there is no doubt that the Lamborghini executives who made the promises to Portman were acting at the behest of, or at the very least with the tacit approval of, Chrysler. Chrysler's then-chairman, Iacocca, announced to a trade publication that Lamborghini would expand ten-fold over the years to follow. Iacocca also spoke to Jolliffe directly at the 1988 gathering of dealers and knew that Portman was "on-board" with the Expansion Plan. Richards, one of two high-ranking Chrysler employees appointed to the Lamborghini board, also acknowledged the major influence Iacocca had with respect to Lamborghini, going so far as to call him "God."

Due to Navaro's absence, Chrysler hired Levy to pilot the Expansion Plan at Lamborghini. Levy was affiliated with Chrysler when he made representations concerning the Expansion Plan to both Portman and its advisors. Additionally, all the funding for the Expansion Plan flowed directly from Chrysler. Finally, although Novaro was President of Lamborghini, and thus not a Chrysler employee, his representations concerning the Expansion Plan were at the direction of Chrysler, since Chrysler executives were the architects of the Expansion Plan. Therefore, an agency relationship existed between Chrysler, its employees, and those at Lamborghini who made promises regarding Portman's role in the Expansion Plan.

### E.

Chrysler also appeals the Superior Court's post-trial ruling that agreed with the jury's finding that the statute of limitations did not bar recovery under the doctrine of promissory estoppel. Title 10, Section 8106 of the Delaware Code provides a three-year limitation for an action based on a promise. 10 *Del. C.* § 8106. Portman and Chaplake commenced this action in April of 1994. Chrysler claims that the promises giving rise to the doctrine of promissory estoppel were broken no later than September 1990, when Lamborghini failed to deliver the Diablos required by January 1990 agreement. Portman argues that the Diablos were merely a small part of the much larger Expansion Plan, and that Portman could not, and did

not, discover the extent of Chrysler's broken promises until early 1992.

As previously noted, we review the denial of the motion for a judgment as a matter of law to determine "whether the evidence and all reasonable inferences that can be drawn therefrom, taken in a light most favorable to the non-moving party, raise an issue of material fact for consideration by the jury." *Mazda Motor Corp.*, 706 A.2d at 530. Deference is proper unless, "under any reasonable view of the evidence the jury could have justifiably found for [the non-moving party]." *Id.* (quoting *Parks*, 221 A.2d at 511).

■ The three year statute of limitations provided by Section 8106 did not begin to run until 1992, and thus Portman's promissory estoppel claim, which was advanced in 1994, was not time barred. The crux of the promises made by Chrysler to Portman involved a ten-fold expansion of Lamborghini's yearly production, based principally on the development of the P140, a car designed and priced for greater mass appeal.

The promises concerning the Expansion Plan began in 1987 and continued for many years. In the fall of 1991, Novaro assured representatives from Portman that the production of Diablos and P140s was on schedule. It was not until 1992 when disgruntled customers sought the return of their deposits from Portman, and when Credit Suisse called Portman's debt obligations that Portman was on notice that the Expansion Plan was an illusion. Those events, which precipitated Portman's collapse into receivership, occurred because Lamborghini had not shipped the higher volume of automobiles in accordance with the Expansion Plan. It was not until 1992 that it became clear that there

would be no increase in volume, and that the promise of the Expansion Plan would never be realized, and thus it was at that point that the statute of limitations began to run.

### III

#### A.

■ Portman cross-appeals the Superior Court's denial of its requested instruction on negligent concealment, as well as the court's decision not to answer a question posed by the jury concerning an element of negligent misrepresentation. We review a jury instruction challenged on appeal to determine "whether the instruction correctly stated the law and enabled the jury to perform its duty." *Russell v. K–Mart Corp.*, 761 A.2d 1, 4 (Del.2000) (citation omitted). We will reverse the trial court's decision "only if the deficiencies undermined the ability of the jury 'to intelligently perform its duty in returning a verdict.'" *Id.* at 5 (citations omitted). Portman argues that an instruction on negligent concealment of facts for the negligent misrepresentation claim should mirror the intentional concealment of facts for a fraud claim, changing only the requisite state of mind. The trial court correctly denied this request because Portman was unable to produce any supporting authority to support its request for negligent concealment of facts.

■ Portman also argues that the trial court's refusal to answer the jury's question—"Can false be defined as 'lack of' information in these elements?"—compels the necessity for a new trial. Specifically, Portman requested that the court read a passage from *Norton v. Poplos*, 443 A.2d 1, 4 (Del.1982)[10] in response to the jury's

---

10. The passage advanced by Portman provides in pertinent part:

A misrepresentation need not be in the form of written or spoken words. Stated

question. The trial court rejected Portman's proffer on the basis that "*Norton* ... was [an action] in equity and not one at law[,]" and thus, because this Court had not "adopted a concealment or 'lack of information' requirement to a negligent misrepresentation claim at law."

Under Delaware law there is a distinction drawn between fraud or misrepresentation actions brought at law versus those commenced in equity. *Gaffin v. Teledyne, Inc.,* 1987 WL 18430, 1987 Del. Ch. Lexis 496, * (Oct. 9, 1987). The trial court correctly concluded that *Norton* was inapplicable because it involved an action in equity and therefore did not serve as authority to extend the lack of information requirement to a negligent misrepresentation claim at law. Thus, the trial court did not err in its refusal to answer the jury's question.

### B.

█ Portman and Chaplake also appeal the Superior Court's denial of their motion for pre-judgment interest. This claim is also reviewed *de novo. Wilmington Country Club v. Cowee,* 747 A.2d 1087, 1091 (Del.1999); *City of Wilmington v. Parcel of Land,* 607 A.2d 1163, 1166 (Del. 1992).

█ Delaware law recognizes the right to collect pre-judgment interest on a debt. *See, e.g., Moskowitz v. Mayor and Council of Wilmington,* 391 A.2d 209, 210 (Del.1978); *Citadel Holding Corp. v. Roven,* 603 A.2d 818, 826 (Del.1992); *Metropolitan Mutual Fire and Ins. Co. v. Carmen Holding Co.,* 220 A.2d 778, 781 (Del. 1966). Although pre-judgment interest is

awarded as a matter of right, and not by judicial discretion, a party must affirmatively request this award. *Collins v. Throckmorton,* 425 A.2d 146, 152 (Del. 1980). Prejudgment interest is appropriate "if a plaintiff requests such an award in its pleadings or raises the issue at trial." *Brandywine 100 Corp. v. New Castle County,* 541 A.2d 598 (Del.1988) citing *Collins,* 425 A.2d at 152.

The Superior Court, in a post-trial ruling, rejected Portman's claim for pre-judgment interest because it had not been "specifically requested" and was thus waived. Portman contends that it sought that element of damages generally in the "Certificate of Value" filed with the Complaint but, more specifically, by including in the Pretrial Stipulation as an issue of fact to be litigated the question. "What is the amount of pre-judgment [sic] due and owing to Plaintiffs." Portman also includes pre-judgment interest calculations in reports prepared by their expert witnesses presented during hearing and responded to by Chrysler.

In *Delaware Electric Cooperative, Inc. v. Duphily,* 703 A.2d 1202, 1206 (Del.1997), we addressed whether a pretrial stipulation and order that was not admitted into evidence at trial could be included in the record on appeal. We began our analysis by noting that "it is a basic tenet of appellate practice that an appellate court reviews only matters considered in the first instance by the trial court." *Id.* at 1206. Supreme Court Rule 9(a) requires that the record on appeal consist of "original papers or exhibits." Original papers are limited to documents filed with and presented to the trial court, excluding documents

---

simply, a misrepresentation is merely an "assertion not in accordance with the facts," *Restatement 2d of Contracts,* § 159, and such an assertion may be made by conduct as well as words. *Id.* Comment a. And although a statement or assertion may

be facially true, it may constitute an actionable misrepresentation if it causes a false impression as to the true state of affairs, and the actor fails to provide qualifying information to cure the mistaken belief. *Norton,* 443 A.2d at 5 (citations omitted).

prepared solely for introduction into evidence. *Id.* We held that because pretrial stipulations with implementation orders serve to amend pleadings and moot factual contentions they are "original papers" and are properly included in the appellate record. *Delaware Electric Coop.*, 703 A.2d at 1208.

▮ In this case, the pretrial stipulation executed by Chrysler, which became an Order of the Court pursuant to Superior Court Civil Rule 16, served to amend the pleadings to include Portman and Chaplake's request for pre-judgment interest. Although the pretrial stipulation's question—"What is the amount of prejudgment [sic] due and owing the plaintiffs"—appears to omit the word "interest," this typographical error should not serve to forfeit recovery on a claim which the parties apparently believed was at issue. Under the circumstances, the Superior Court's ruling that the claim for pre-judgment interest was waived is not supported by the record and is reversed.

### IV.

For the foregoing reasons, with respect to all of the issues raised by Chrysler on appeal, we AFFIRM the holding of the Superior Court and the findings of the jury. As to Portman's cross-appeal, we AFFIRM the trial court's denial of Portman's motion for a new trial on the negligent misrepresentation claim, and we REVERSE and REMAND for further proceedings consistent with this opinion with respect to the request for award of pre-judgment interest.

Pursuant to Supreme Court Rule 18, the time within which a motion for reargument may be filed in this matter is shortened to seven days from the date of this opinion.