COURT OF CHANCERY
OF THE
STATE OF DELAWARE

SELENA E. MOLINA
SENIOR MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report: January 31, 2025
Date Submitted: August 5, 2024

Dean A. Campbell, Esquire
Law Office of Dean A. Campbell, PA
703 Chestnut street
Milton, DE 19968

Jason C. Powell, Esquire
Thomas Reichert, Esquire
The Powell Firm, LLC
1813 N. Franklin Street
Wilmington, DE 19802

Re: *John T. Buck v. The Estate of Eileen P. McCaffery, et al.*,
C.A. No. 2021-0405-SEM

Dear Counsel:

Through this action, the plaintiff seeks to enforce a purported oral contract with his mother. Per the plaintiff, his mother agreed—or promised—to bequeath to him a specific parcel of land in Sussex County. When she failed to do so, and left her entire estate to the plaintiff's brother, the plaintiff initiated this action challenging the administration. For the reasons explained herein, I find that the plaintiff has failed to prove the existence of an enforceable oral contract by the required clear and convincing evidence. His alternative theories likewise fail. Thus, I recommend judgment for the defendant, that each side bear its own fees, and that the defendant's costs be shifted to the plaintiff. This is my final post-trial report.

## I.     BACKGROUND[1]

This action revolves around the late Eileen P. McCaffery (the "Decedent"), who passed away on January 14, 2021, leaving behind her four children—John Buck (the "Plaintiff"), James Buck III (the "Defendant"),[2] Mary Anne Dillon, and Karen Bowen.[3]

Before she passed, on December 2, 2020, the Decedent executed a last will and testament (the "Will") revoking all prior wills, and appointing the Defendant as

---

[1] The facts in this report reflect my findings based on the record developed at trial on April 9, 2024, as well as those agreed upon by the parties in the joint pretrial stipulation. *See* Docket Item ("D.I.") 61 ("Pretrial Order"), 66 ("Tr."). Citations to the trial transcript are in the form "[Last name] Tr." referring to the testimony of the identified person. Defined parties are identified with that designation. The parties' jointly submitted exhibits are cited as "JX __." I grant the evidence the weight and credibility I find it deserves.

[2] To be clear, as identified in the Pretrial Order, "[n]otwithstanding the case caption in this matter, there are no claims currently asserted within this litigation directed to [the] Defendant, individually. The only claim pending is directed to the Estate of Eileen McCaffery, for which [the] Defendant is the [e]xecutor." ¶ 10. Despite this, in the stipulated post-trial briefing schedule and order, the parties agreed that the "Defendants' [a]nswering [b]rief" (*i.e.*, plural), would be filed in mid-July. D.I. 65. There were also various inconsistencies in the case caption submitted in different filings throughout this action, further complicating matters. This report disposes of these aspects as immaterial errors and addresses the only live claim against the Decedent's estate; the reference to the "Defendant" as such is not meant to imply any individual liability, but rather to clarify that the Defendant is the acting fiduciary of the estate against which relief is sought.

[3] *See* Pretrial Order ¶ 2(C); Plaintiff Tr. 8:7–12 (Q: "[H]ow many children did your mother have?" A: "Four."); Pretrial Order ¶ 2(A) ("John Buck, and . . . James Buck, are brothers of which [the Decedent] was their mother."); *id.* ¶ 2(G) ("Mary Anne Dillon and Karen Bowen are children of [the Decedent]."). The Decedent was also survived by multiple grandchildren and at least one great-grandchild. *See* Defendant Tr. 134:2–3 (referring to the Decedent's "eight grandkids"); Dalecki Tr. 169:18 (referring to the Decedent's "great-grandchild").

the executor and sole beneficiary of her estate.[4] After the Decedent's death, the Defendant petitioned the Register of Wills for authority to act as executor.[5] On February 12, 2021, the Will was admitted to probate, and letters testamentary were issued to the Defendant.[6] The Plaintiff objects to the Defendant probating the Decedent's estate as directed in the Will, arguing that his mother agreed—or promised—otherwise. To address the Plaintiff's claims, I journey back to the 1970s and work my way to present day.

### A. The Start of the Campground – 1970

The Decedent and her husband had made a home for themselves and their family in Claymont, Delaware. They built a life there and had a network of close friends in the area. But, sometime in or around 1970, they decided to buy wooded property in Sussex County, with the hope and aspiration of turning into it into a campground.[7] They began with an original parcel purchase consisting of approximately seventeen acres.[8] Together they turned those seventeen acres into a

---

[4] JX15; *In re Eileen P. McCaffery*, Folio No. 22394 ("ROW") D.I. 1. "Because the Register of Wills is a Clerk of the Court of Chancery, filings with the Register of Wills are subject to judicial notice." *Arot v. Lardani*, 2018 WL 5430297, at *1, n.6 (Del. Ch. Oct. 29, 2018).

[5] ROW D.I. 1.

[6] ROW D.I. 2–3.

[7] Plaintiff Tr. 8:22–9:1.

[8] *Id.* at 8:15–19.

five-section campground, ultimately consisting of 186 camping sites available for both overnight and seasonal camping (the "Campground").[9]

The Decedent and her husband operated the Campground together until his death in 1988. Thereafter, the Decedent took over for a bit before handing the reigns off to her sons, the Plaintiff and the Defendant, around 1997.[10] The Plaintiff and the Defendant incorporated their business in or around that same year and ran the Campground together for about five years.[11] But, during that time, the Defendant's life changed materially. By the end of that five-year period, the Defendant was committed to managing his own campground property in Florida.[12] This left the Plaintiff, who remained in Delaware, as the *de facto* day-to-day manager of the

---

[9] *Id.* at 10:4–23. The Campground was known as Jim's Hideaway. *See id.* at 8:19–9:1. The Decedent and her husband also purchased additional land around the Campground. They started with an approximately eight-acre parcel, and another nearly three-acre parcel, though they never expanded the Campground into either. *Id.* at 9:17–10:9.

[10] *Id.* at 12:4–22, 14:18–23. Per the Plaintiff, the Decedent no longer wanted to be at the Campground "all the time." *Id.* at 13:7–9. Although the Decedent knew of the Plaintiff's interest in continuing with the business, the Decedent "wanted to be fair with all of her kids[,]" and she proposed that the Plaintiff, the Defendant, and their sister, Karen, go into business together. *Id.* at 13:9–14. Karen was not interested, but the Plaintiff and the Defendant were. *See id.* at 13:15–17.

[11] The Plaintiff and the Defendant used a corporate name reserved by their father: Coastal Enterprises, Inc. *Id.* at 14:4–17. The Defendant was the president, the Plaintiff was the secretary and treasurer, and they held 50/50 interests. *Id.*

[12] Defendant Tr. 138:1–13. Per the Plaintiff, it was the Decedent who purchased the campground for the Defendant to manage. Plaintiff Tr. 18:6–8.

business.[13] But the Decedent remained involved, to a limited extent; while the brothers managed the business, the Decedent retained ownership of the property on which the Campground operated.[14] And she had the right to do with it what she pleased.

## B.     The Sale of the Campground – The Early 2010s

More than twenty years after her husband's death, the Decedent decided to part ways with the Campground. The Plaintiff, who was living on the property, advocated against any sale of the land on which the Campground sat.[15] He wished to continue the business, remain on the property, and avoid any major changes. But he was unsuccessful in changing his mother's mind. In the early 2010s, the Decedent sold the land on which the Campground operated for around $5.5 million dollars.[16]

---

[13] *See id.* at 17:21–19:1.

[14] As the Plaintiff explained, the Decedent charged the brothers' business rent for their use of the land. *Id.* at 14:20–23. The company was also "responsible for any and all upkeep, maintenance, repairs." *Id.* at 15:3–4. And, in return, the brothers enjoyed the profits: they "took a salary, paycheck every week." *Id.* at 15:12–18.

[15] *Id.* at 31:5–16.

[16] *See* JX18 at 1. The sale was not nearly as simple as this wording suggests. Per the Plaintiff, he and the Decedent only planned to sell part of the subject land; leaving him a portion on which his family was living. But the buyer believed they had reached a deal on the entire property. To close, the Plaintiff testified that he negotiated with his mother to receive the property at issue here—hence the crux of his claim. *See* D.I. 67 ("Pl.'s Op. Br.") at 5–7. Only with that arrangement, per the Plaintiff, did the sale of the Campground close.

Although not his preferred outcome, this sale ultimately benefitted the Plaintiff in four ways. First, the Decedent allowed the Plaintiff to remove and retain the double-wide mobile home he had installed before the sale.[17] Second, the Decedent, in effect, gave the Plaintiff $1 million from the sale proceeds; following the sale, the Decedent deposited $1 million of the proceeds into a joint bank account between her and the Plaintiff, which she never accessed or utilized after its creation.[18] Third, the Decedent purchased the Plaintiff a home in Dagsboro for roughly $160,000.00 to $170,000.00, which she had titled as owned by the two of them, with the right of survivorship.[19] Fourth, and finally, the Decedent gave the Plaintiff permission to construct a pole barn on the subject twelve-acre parcel at issue (the "Property") to store physical property left over from the Campground.[20] He did

---

[17] *See* Plaintiff Tr. 34:18–21, 90:10–19.

[18] Although the bank account was jointly titled in both the Plaintiff and the Decedent's names, the Decedent never used the account after establishing it. *Id.* at 64:13–24. The account transferred into the Plaintiff's sole name upon the Decedent's death. JX18 at 1; Plaintiff Tr. 40:12–23, 64:16–21.

[19] *Id.* at 47:9–24, 92:5–14. Per the Plaintiff, this was completely in character for the Decedent who "always wanted to make sure everybody had a home, . . . her kids and grandchildren." *Id.* at 43:11–13; *accord* Dalecki Tr. 158:16 (describing the Decedent as follows: "Kind. Would help anybody out.").

[20] Plaintiff Tr. 100:10–19.

so, and for over a decade stored his belongings therein without paying rent or otherwise compensating his mother.[21]

### C. The Georgetown Property – 2018

In addition to the Campground and surrounding properties, the Decedent also owned property in Georgetown that backed up against the Redden State Forest (the "Georgetown Property"). The Georgetown Property was originally part of a farm used for training horses and had been leased to various trainers over the years. During the Decedent's ownership, it was used primarily for hunting, especially by the Plaintiff.[22] Sometime in 2018, after her husband passed, the Decedent decided to sell the Georgetown Property.[23]

The Plaintiff, again, was not on board with the Decedent selling her real estate. This time, it was not due to his current attachment to the property. Rather, for the Georgetown Property, the Plaintiff had a future interest. The Plaintiff had expected, based on his understanding of the Decedent's estate plans, that the Georgetown Property would pass to him upon the Decedent's death. He wanted to protect that

---

[21] *Id.* at 100:20–101:1. Despite this, the Plaintiff continuously emphasizes the cost to construct the pole barn and make improvements to it, in addition to the "sweat equity" he paid. *E.g.*, Pl.'s Op. Br. at 7–10. Yet the Plaintiff admitted that his mother gave him the majority of the money used for those improvements. Plaintiff Tr. 56:7–11.

[22] *Id.* at 26:17–19.

[23] *Id.* at 67:22–68:12.

interest and believed that, at bottom, he should receive proceeds from any pre-death sale.[24] But he didn't—the Decedent sold the Georgetown Property and did not share the proceeds with the Plaintiff.[25]

The Decedent's choices, and the Plaintiff's reaction to them, caused a rift in their relationship. The two had a falling out, and the Plaintiff and the Decedent only spoke three more times before the Decedent's passing on January 14, 2021.[26] Per Beverly Dalecki, one of the Decedent's closest friends of 66 years, the Decedent was incredibly hurt by their estrangement, particularly because she and the Plaintiff had enjoyed a close relationship.[27]

### D.     The Decedent's Estate Planning

The Decedent did not wish to leave the administration of her estate up to Delaware's intestacy laws. Rather, she planned for how her various assets should pass through several different iterations of a final will and testament. She initially turned to her longtime attorney, Lawrence B. Steele, III. In or around July 7, 2011, Mr. Steele drafted a will to reflect the Decedent's then-wishes. Through that will, the

---

[24] Defendant Tr. 140:5–11. This is so, despite the Plaintiff's admission that the Decedent never promised to give him proceeds from the sale. Plaintiff Tr. 105:11–17.

[25] Per the Plaintiff, the Decedent remarked "I never told you you were getting that" and acted like it was the first she had heard of his interest when he complained a couple of months post sale. *Id.* at 70:9–13.

[26] *Id.* at 111:19–112:4.

[27] *See* Dalecki Tr. 170:17–20.

Decedent left her Florida real property to the Defendant, other identified properties to the Decedent's daughters, and the Campground and all related improvements thereto for the Plaintiff, in addition to some other property. The Plaintiff was also named executor of the estate.[28]

Thereafter, in 2014 or 2015, the Decedent decided she wanted to change her plans and she turned to her dear friend, Ms. Dalecki.[29] The Decedent told Ms. Dalecki that she wished to prepare a new will, which would leave her assets to the Defendant and her daughters, with nothing further passing to the Plaintiff.[30] Ms. Dalecki drafted a will for the Decedent, as requested, and it was apparently signed, witnessed, and notarized. But no such will is in evidence, and Ms. Dalecki testified that she does not believe she has a copy of it.[31]

Then, in 2020, the Decedent reconsidered her estate plans. As her death grew nearer, the Decedent was estranged from all of her children, except the Defendant; he lived with, and supported her, during the last three years of her life. But she held out hope that her other children would reappear.[32] Perhaps realizing she was waiting

---

[28] JX14.

[29] *See* Dalecki Tr. 157:14–15.

[30] *Id.* at 163:5–164:10.

[31] *Id.* at 173:1–2.

[32] *See* Defendant Tr. 152:17–24.

in vain, the Decedent ultimately executed the Will dated November 25, 2020, leaving everything to the Defendant.[33] She died less than two months later, on January 14, 2021.

## II.    PROCEDURAL POSTURE

The Plaintiff initiated this action against the Decedent's estate and the Defendant, in his individual capacity, on May 10, 2021.[34] In his complaint, the Plaintiff pled four counts to: (I) invalidate the Will for lack of capacity; (II) invalidate the Will due to undue influence; (III) enforce a contract to create a will; and (IV) impose a constructive/resulting trust.[35]

The estate and the Defendant filed a motion to dismiss (the "Motion to Dismiss") on June 14, 2021, which was fully briefed on October 18, 2021.[36] I held argument on the Motion to Dismiss on December 22, 2021, at which point I requested supplemental briefing to address the implications of my then-recent *Sweeney v. Sweeney* decision.[37] The supplemental briefing was submitted on January

---

[33] JX15.

[34] D.I. 1. Mary Anne Dillon and Karen Bowen, two of the Decedent's children, were identified as "Notice Parties." *Id.* ¶ 4. Each of them submitted an answer to the complaint, *see* D.I. 14–16, but have otherwise not been involved in this case. I have neither considered nor assessed those answers in connection with this post-trial report.

[35] D.I. 1 ¶¶ 16–31.

[36] D.I. 11, 17, 21, 25.

[37] *See* D.I. 29 at 35:21–36:7; 2021 WL 5858688 (Del. Ch. Nov. 30, 2021), *adopted*, 2021 WL 5999620 (Del. Ch. Dec. 17, 2021). The *Sweeney* supplemental briefing pertained to

24, 2022 and, ultimately, I issued a final report on April 29, 2022, recommending that the Motion to Dismiss be granted in part and denied in part, such that the will contest be dismissed, but the contract claim remain.[38] Neither side filed exceptions, and the Chancellor adopted that report as an order of this Court on June 8, 2022.[39]

After hitting a few discovery-related bumps in the road,[40] we got things back on track and I held a one-day trial on April 9, 2024.[41] Post-trial briefing was complete on August 5, 2024, at which point I took this matter under advisement.[42]

## III. ANALYSIS

The primary issue pending before me is whether the Plaintiff proved that he and his mother had an enforceable contract to make a will.[43] He did not. Nor did he

---

the now-dismissed count for invalidation of the Will. Interested readers are directed to my Motion to Dismiss ruling for greater context and explanation. D.I. 32.

[38] D.I. 30–32. I recommended that Counts I and II be dismissed with prejudice and Count IV be dismissed without prejudice to the Plaintiff's ability to seek the requested remedy (which was improperly structured as a separate count) for the sole remaining claim, Count III. D.I. 32 at 16.

[39] D.I. 33.

[40] *See* D.I. 36, 38–47.

[41] D.I. 63, 66.

[42] D.I. 67, 69, 71.

[43] I do not address the issue of the return of the Plaintiff's personal property. *See* Pl.'s Op. Br. at 24. It appears that the Plaintiff is both welcome and encouraged to retrieve and remove that property. D.I. 69 ("Def.'s Ans. Br.") at 30–31. Seeing that there is no dispute ripe for my adjudication, I encourage the parties to facilitate the removal of the Plaintiff's personal property without the need for judicial intervention.

establish a basis on which he is entitled to his alternative request for a constructive or resulting trust. But I do not find that the Plaintiff's unsuccessful claims were brought or prosecuted in bad faith and, thus, deny the Defendant's request for fee shifting. The Defendant is entitled to costs, however, as the prevailing party. I will address these matters in turn.

###### A. The Plaintiff failed to prove by clear and convincing evidence that he and his mother had an oral contract to make a will.

The Plaintiff faces a high bar to prove that his mother was duty-bound to execute a will in his favor. Although "[g]enerally, under . . . Delaware's Statute of Frauds, oral promises to make a will are unenforceable[,] . . . Delaware courts have held oral contracts to make a will enforceable where there has been a showing of part performance of a services contract in reliance on such oral contract."[44] Because this Court is a court of equity, it "may enforce a partly performed oral contract [to make a will] upon proof of clear and convincing evidence of actual part performance."[45] To take advantage of the actual part performance exception, the act "should be such as would not have been done independent of some contract or agreement relative to land; because, as you are from the act performed to infer a

---

[44] *Boush v. Hodges*, 1996 WL 652762, at *6 (Del. Ch. Nov. 6, 1996).

[45] *Hughes v. Frank*, 1995 WL 632018, at *2 (Del. Ch. Oct. 20, 1995).

contract, it must therefore be an act of that description which will not admit any other inference."[46]

"[A] party seeking to specifically enforce an oral agreement to make a will must meet a heightened burden of proof[,]" and the Court "scrutinizes such applications closely, requiring the party alleging the existence of the agreement to prove both the creation of the contract and its terms by clear and convincing evidence."[47] Although "not insurmountable, it is a heavy burden."[48] To satisfy it, "the evidence presented must 'produce in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable, reasonably certain, and free from serious doubt.'"[49] This is so, given the fact that "the testator never will be able to present [her] version of events, creating an increased risk of fabrication."[50]

The Plaintiff failed to prove the existence of the alleged oral agreement by the required clear and convincing evidence. Even setting aside that the Plaintiff's

---

[46] *Sargent v. Schneller*, 2005 WL 1863382, at *4–5 (Del. Ch. Aug. 2, 2005) (citation and quotation marks omitted).

[47] *McCloskey v. McCloskey*, 2014 WL 1824712, at *7 (Del. Ch. Apr. 24, 2014).

[48] *Brown v. Wiltbank*, 2011 WL 5027057, at *6 (Del. Ch. Oct. 13, 2011).

[49] *McCloskey*, 2014 WL 1824712, at *7 (citing *Brown*, 2011 WL 5027057, at *6).

[50] *Id.*

evidence relies heavily (if not exclusively) on his self-serving testimony,[51] the Plaintiff has not identified who made an offer, for what, or when. Rather, he argues conclusively that he and the Decedent entered into an enforceable oral contract that she would create a will giving him the Property. Meanwhile, his story (and the terms of the purported agreement) varied throughout this action and are unconvincing.[52] Rather, the alleged terms are vague and unclear, and cannot be substantiated by any credible evidence, let alone clear and convincing evidence. And although the

---

[51] *Cf. Lingo v. Lingo*, 2009 WL 623720, at *12 (Del. Ch. Feb. 26, 2009) (declining to find self-serving testimony as sufficient evidence of a salary or gift agreement, particularly when that testimony was "not credible"); *Sachs v. Sachs*, 2023 WL 2379389, at *14, n.170 (Del. Ch. Mar. 7, 2023) (declining to find self-serving testimony sufficient to prove an agreement, given "equivocal testimony" to the contrary).

[52] For example, in the complaint, the Plaintiff alleged that in or around 2013, he and the Decedent reached an agreement for him to receive compensation "for his investment in the land through his inheritance when [the] Decedent died" in the form of 40% of the Decedent's estate passing to the Plaintiff, specifically the "Property upon which the pole building is situated[.]" D.I. 1 ¶¶ 10–11. That same document also identified the agreement as having been made "[i]n or around the years 2012/2013." *Id.* ¶ 25. When asked about the discrepancy, the Plaintiff responded that he is "terrible with dates." Plaintiff Tr. 86:15–16. Then at trial, the Plaintiff testified that the Decedent offered him the Property "in exchange" for him and his family moving from their home on the three-acre parcel near the Campground. *Id.* at 30:6–31:16. And as acknowledged in the Plaintiff's own opening post-trial brief, apparently the "Decedent made [the Plaintiff] the offer," after the Decedent was offered "a substantial amount of money" for the parcel his home was on, "that if he moved his home off" of it, the Decedent "would give him the [Property,] provided he subdivide off a one (1) acre parcel for John's niece" (the Decedent's granddaughter), which he accepted. Pl.'s Op. Br. at 7; Plaintiff Tr. 38:14–23. According to the Plaintiff, to effectuate this deal, the Decedent would "change her will" so that the Plaintiff would get the Property. *Id.* at 39:15–17. These conflicting stories undermine the Plaintiff's already questionable credibility.

Plaintiff points me to *Eaton v. Eaton* as having "facts . . . significantly similar" to those here, he neglects to acknowledge that in *Eaton*, there was "no doubt that an agreement was reached by the deceased father and his three sons" given their conduct before and after his death, consistent testimony in support thereof by both the plaintiffs and defendant, and correlative documentary evidence.[53] Here, the Plaintiff urges me to recognize that, given the "circumstances and conduct of the parties, there is little doubt that [the Plaintiff's] account is accurate."[54] But, as I have explained, I have more than "little doubt" about the accuracy of the Plaintiff's account. Although the Plaintiff's conduct may have been consistent with his belief or hope that he would receive the Property, there is insufficient evidence to suggest that his conduct was a result of an oral agreement he had with his mother.[55]

---

[53] *Eaton v. Eaton*, 2005 WL 3529110, at *3 (Del. Ch. Dec. 19, 2005).

[54] Pl.'s Op. Br. at 14.

[55] *Cf. Sargent*, 2005 WL 1863382, at *6, n.44 ("I am also unable to conclude that the only plausible explanation for the yard work is that there was an oral contract. [The plaintiff] may simply have believed that he would one day purchase the [p]roperty and he was getting a head start on some work. While [the plaintiff] may have relied on his subjective belief that he would eventually by the purchaser of the [p]roperty, his belief does not create an enforceable oral contract."). Any improvements the Plaintiff made to the Property were either gratuitous to his mother, or the Plaintiff acting in anticipation of one day owning the Property, based on his own individual hopes and expectations. That does not establish by the requisite clear and convincing evidence that an oral agreement was made.

### B. The Plaintiff's alternative theories also fail.

The Plaintiff proffers several alternative theories for relief, all of which fail. First, the Plaintiff's promissory estoppel argument suffers from the same flaws as his oral contract argument. To prevail under the doctrine of promissory estoppel, he needed to demonstrate by clear and convincing evidence that his mother made him a promise;[56] he failed to do so. Second, the Plaintiff "argues both for a resulting trust and constructive trust" "in the event the Court does not grant specific performance[.]"[57] But as I explained in my Motion to Dismiss ruling, these are remedies, not requests for relief, and would only "be available *if the Plaintiff prevails on his remaining claim*."[58] The Plaintiff did not prevail on his remaining claim. And, even if the Plaintiff properly put a claim for unjust enrichment before me, he did not prove the elements of unjust enrichment by a preponderance of the evidence.[59]

---

[56] *Chrysler Corp. v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1032 (Del. 2003) (citation and quotation marks omitted).

[57] Pl.'s Op. Br. at 23. The Plaintiff proffered Kathy C. Brown, a land appraiser with over 23 years' experience, as an expert to opine on "the increased value of the [P]roperty based on the improvements" the Plaintiff constructed thereto, to the tune of $150,000.00. As a result, the Plaintiff argues that his investment of "large amounts of money and sweat equity" into the Property increased its value by that amount, which will now solely benefit the Defendant. *Id.* at 23–24. Thus, he believes he is entitled to recoup that amount. I disagree.

[58] D.I. 32 at 16 (emphasis added).

[59] *See Schaeffer v. Lockwood*, 2021 WL 5579050, at *20 (Del. Ch. Nov. 30, 2021) (laying out the elements for unjust enrichment: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification,

**C.      The Plaintiff did not engage in bad faith litigation, but the Defendant is entitled to costs as the prevailing party.**

The Defendant asks that his fees be shifted to the Plaintiff under the bad faith exception to the American rule. I find no evidence of bad faith, and thus decline to shift fees. The Defendant is, however, entitled to costs as the prevailing party.

"Under the American Rule, litigants are expected to bear their own costs of litigation absent some special circumstances that warrant a shifting of attorneys' fees, which, in equity, may be awarded at the discretion of the court."[60] "The bad faith exception to the American Rule applies in cases where the court finds litigation

---

and (5) the absence of a remedy at law). "As a general rule, where one person performs services for another and those services are accepted without condition, in the absence of an express promise to pay for the services such a promise is ordinarily implied. However, where the person who performs the services is a near relative of the person receiving the benefit of those services, it is presumed that the work was performed gratuitously and clear proof to the contrary is necessary to overcome the presumption." *In re Wapniarek*, 1986 WL 9611, at *5 (Del. Ch. Sept. 2, 1986) (citation and quotation marks omitted); *see id.* at *2 (finding the work performed "could have been motivated by a general sense of responsibility to [the responding party's] family rather than any contractual obligation"). And although the Plaintiff attempts to distinguish *Wapniarek* by arguing that *Wapniarek* applies to services, whereas here the purported improvements were not services, this Court has previously discussed *Wapniarek* outside of the services context in relation to improvements. *See Sargent*, 2005 WL 1863382, at *6, n.43 (identifying *Wapniarek*'s "holding that even though the plaintiff had made improvements to the land, including repairs and improvements to a farmhouse, that because his work could be explained beyond the existence of a contract, the plaintiff had not satisfied part performance").

[60] *Beck v. Atl. Coast PLC*, 868 A.2d 840, 850 (Del. Ch. 2005).

to have been brought in bad faith or finds that a party conducted the litigation process itself in bad faith, thereby unjustifiably increasing the costs of litigation."[61]

This Court does not, however, lightly shift fees under the bad faith exception. "A party seeking to shift fees must satisfy the stringent evidentiary burden of producing clear evidence of bad faith."[62] "To capture the sorts of vexatious activities that the bad-faith exception is intended to address, this court employs the 'glaring egregiousness' standard."[63] The Defendant has failed to prove that the Plaintiff engaged in such glaringly egregious conduct.

The Defendant argued that the Plaintiff proceeded with this case despite the fact that his claim "was never truly viable."[64] Specifically, the Defendant provided that "[t]he maintenance of this claim through a trial is bad faith considering ample case law that a plaintiff cannot prevail on an oral contract to make a will without the testimony of disinterested witnesses and/or corroborating documents to support the existence of the claim[,]" and by the omission of negative facts and testimony.[65]

---

[61] *Id.* at 850–51.

[62] *Myers v. Acad. Sec., Inc.*, 2023 WL 6380449, at *1 (Del. Ch. Oct. 2, 2023) (ORDER) (citation and quotations omitted), *adopted*, 2023 WL 6846984 (Del. Ch. Oct. 16, 2023).

[63] *Seidman v. Blue Foundry Bancorp*, 2023 WL 4503948, at *6 (Del. Ch. July 7, 2023).

[64] Def.'s Ans. Br. at 28.

[65] *Id.* at 29.

Although I herein find in the Defendant's favor on the merits, I decline to find that the Plaintiff pursued his case in bad faith. The case was weak, and ultimately unsuccessful but, all told, I find the Plaintiff's conduct was not glaringly egregious. Nonetheless, under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." The Defendant is the prevailing party, and I find costs should be shifted in the Defendant's favor.

## IV.    CONCLUSION

For these reasons, I find the Plaintiff failed to prove that he and the Decedent entered into an oral contract to create a will. His alternative requests for relief likewise fail. Judgment should be entered for the Defendant. Fees should not be shifted but the Defendant is entitled to costs as the prevailing party. This is my final report, and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,
/s/ *Selena E. Molina*
Senior Magistrate in Chancery