**IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE**

**IN AND FOR NEW CASTLE COUNTY**

| | | |
|---|---|---|
| TEKTREE, L.L.C., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. CPU4-12-002911 |
| | ) | |
| BORLA PERFORMANCE INDUSTRIES, | ) | |
| INC., and RONGYA XIA, | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: November 13, 2014
Decided:   February 24, 2015

R. Stokes Nolte, Esq.
Reiley, Janiczek & McDevitt
Delle Donne Corporate Center
1031 Centre Road, Suite 210
Wilmington, DE, 19805
*Attorney for Plaintiff*

Scott G. Wilcox, Esq.
Whiteford, Taylor, and Preston
405 King Street, Suite 500
Wilmington, DE 19801
*Attorney for Defendant Borla
Performance Industries, Inc.*

Kelly A. Green, Esq.
Smith, Katzenstein & Jenkins
800 Delaware Avenue, 10th Floor
P.O. Box 410
Wilmington, DE 19899
*Attorney for Defendant Rongyu Xia*

**DECISION AFTER TRIAL**

## NATURE AND STAGE OF PROCEEDINGS

In July 24, 2012, Plaintiff TekTree, LLC ("TekTree") brought this action against Borla Performance Industries, Inc. ("Borla") and Rongyu Xia ("Xia") alleging breach of contract and tortious interference with contractual relations. TekTree sought damages in the amount of $40,000.00. The claim for breach of contract alleges that TekTree entered into a professional agreement with Borla by which Borla employee Xia would provide services to TekTree client, Lincoln Financial Group. Further, that the terms of that agreement required both Borla and Xia to abstain from providing services directly or indirectly to Lincoln Financial Group ("Lincoln") during the terms of the agreement and one year after the expiration of the agreement. The claim against Xia also alleges she breached the Demand Note/Training Contract and the employment agreement.

On August 31, 2012, Borla filed an answer which it denied that it breached the contract, and also denied any liability for the acts or omissions of Xia. Borla also brought a counterclaim in the amount of $15,750.00 for unpaid invoices submitted to TekTree for payments made to Xia. On September 25, 2012, Xia, proceeding *pro se*, filed an answer which denied she breached the contract, and the Demand Note/Training agreement

By order dated on April 5, 2013, the Court granted and Xia filed an amended answer. In her amended answer, Xia continues to deny breaching the contract, but she admits she signed the Note and employment agreement. She alleges six affirmative defenses, and she brought several counterclaims. She claims TekTree induced her to enter the agreement by promising that they would arrange all necessary work permits, and that employment is subject to – and would begin only after – the required H1B Visa work permit was obtained. She was to receive a salary of $50,000.00 paid in accordance with the Company's payroll procedures. Xia also alleges that she was to receive training at various locations, which did not take place; thus, TekTree breached its contract with her.

2

Xia also alleges breach of implied covenant of good faith and fair dealing based upon TekTree's misrepresentation that they would employ her directly, provide her a salary and benefits, and obtain her H1B visa. She relied upon these material misrepresentations when she accepted the position, signed the note, travelled to Michigan on two occasions for training, and stopped looking for other employment.

**FACTS**

At the beginning of trial, the parties submitted stipulated exhibits.[1] Thereafter Raghuveer Bandi ("Bandi"), President of TekTree, testified that for nine years, he was the head of the company. He stated that TekTree provides staffing to corporation clients, which need Information Technology assistance. TekTree trains candidates in Information Technology Services ("IT") for job placement with its clients. The training consists of online courses, as well as in-classroom training. Upon successful completion of training, the candidate is placed with one of TekTree's clients. In return, TekTree is paid a percentage of the candidate's salary for service provided to the company. In addition to offering training and job placement, TekTree offers health benefits, relocation expenses for a candidate's move to the training facility in Detroit, Michigan, and free H1 B Visa processing and sponsorship for citizens of foreign countries.[2]

Bandi testified that on June 7, 2011, Xia signed the Note,[3] which provided that she would not voluntarily terminate her employment with TekTree for one year following the successful completion of training and subsequent employment by TekTree LLC. The agreement further provided that if Xia failed to comply with the agreement, she would pay as liquidated damages the cost of training in the amount of $5,000.00, with interest at 10.00% per annum.[4] As a part of the

---

[1] The parties stipulated to twenty-two joint exhibits.
[2] *See* Joint Ex. 10. As a Chinese National, Xia needed documentation from her employer to secure a H1 B visa to continue her employment.
[3] *See* Joint Ex. 1
[4] Joint Ex. 1, ¶ 1.

3

arrangement, TekTree and Xia executed an employment document providing that Xia would receive a salary of $50,000 per year.[5] Bandi testified that training thereafter started in Detroit, Michigan.[6] She was trained in the Informatica Platform for data entry. After she completed the training, she received a job assignment, which consisted of him giving Xia's resume to Panzier who had a relationship with Lincoln Financial, where the work was to be performed. Therefore, the arrangement was for TekTree to deal with Panzier and Panzier to deal with Lincoln Financial.

Bandi further testified that when the problem developed with the HIB visa, they went to Borla whereby Borla would employ Xia for three months to satisfy employee status. However, after three months after being employed, Xia indicated she no longer needed the HIB visa, but wanted a different type and needed his assistance. To facilitate the TekTree-Borla arrangement for Xia, they executed a purchase order for Xia to provide services to Lincoln National.[7] She was placed through Panzier, who is a client of TekTree.[8] Xia worked with Lincoln National under this arrangement from October 17, 2011 until April 30, 2012, when she resigned from her employment with Borla[9]

On cross examination from Borla, Bandi acknowledged that there was no signed purchase order to extend Xia's services beyond March 2012; however, he denied Borla's assertion that TekTree stopped paying Borla well before learning of her resignation from the company. Bandi also insisted that although no direct relationship existed, Lincoln National was an indirect client of TekTree through Panzier.

---

[5] *See* Joint Ex. 2.

[6] Bandi acknowledged that Xia lived in North Carolina at the time of the contract's signing, and that she moved to Michigan to complete training. However, Bandi also testified that Xia stayed in housing provided by TekTree.

[7] The testimony of the parties differs on this point. Xia and Borla testified that Xia was not offered the position with Borla until three months later, when the founder and CEO of Borla, who was a personal friend of Xia, offered her a position within Borla's marketing department.

[8] As a term of employment, Borla offered to sponsor Xia for the purpose of obtaining the work visa. Borla's role was to merely serve as an intermediary in the transaction; Panzier, Lincoln National's representative in the transaction, would pay TekTree for Xia's services; TekTree would receive a percentage and send payment to Borla; Borla would pay that amount to Xia.

[9] At some point after these discussions, Xia married, and the need to obtain the H1 B work visa was no longer necessary.

On cross examination from Xia, Bandi testified that upon completion of training, the Note required Xia to work for TekTree for at least one year before voluntarily terminating the agreement.[10] However, Bandi stated that the contract never began, because Xia did not submit her paystubs, one of the requirements for obtaining the H1B visa. Bandi relies on a cache of emails as evidence that TekTree made several attempts to provide the H1B visa for Xia.[11]

On re-direct, Bandi testified that he first learned of the paystub issue preventing the H1B visa transfer in an e-mail exchange with Xia on November 29, 2011.[12] In his November 30, 2011 response, he indicated that Xia needed to call Sarah, TekTree's immigration attorney, and provide the requisite documents in order to have the visa processed.[13]

During further cross examination by Borla, Bandi clarified TekTree's position that it was Xia who approached Lincoln National, not Borla. When presented, asked what Borla could have done under the agreement to stop Xia from going to work for Lincoln National, Bandi did not provide a definitive answer. Upon questioning concerning TekTree's calculation of damages against Borla, Bandi testified that the amount sought from Borla is $20,000.00, which is the amount he expected to earn over the life of the contract, which could have lasted for up to three years. However, Bandi acknowledged that the contract was not renewed beyond the first six months.

Next, Alexander Borla ("Borla"), CEO of Borla, testified that Borla manufactures exhaust systems, does not employ Informatica-trained consultants because it has no need for such services. Rather, Borla offered Xia employment based on the recommendation of a faculty member at Tennessee State University. She was employed from 2011-2012 to help Borla market its products in the Chinese market.[14] Borla further testified that during Xia's employment, Borla provided H1B

---

[10] *See* Joint Ex. 1.
[11] *See* Joint Ex. 14.
[12] *See* Joint Ex. 14.
[13] *Id.*
[14] *See* Joint Ex. 9.

sponsorship for Xia. Shortly after hiring Xia, Borla recognized certain issues which prevented them from entering China's market, and informed Xia that it could no longer support her H1B visa application. Borla stated that he advised Xia to update her H1B sponsorship immediately. She saw a solution to the problem with the present arrangement between TekTree and Borla. Borla stated that his understanding of the agreement was that TekTree was going to hire and train Xia as an information technology consultant. The only responsibility of Borla was to exchange purchase orders and checks for payment between TekTree and Xia. Borla further stated that Borla never received compensation or any tangible benefit for its role as "middle man" between TekTree and Xia. Borla testified that while he did sign the agreement containing the non-compete clause, Borla was not required to take any affirmative action to prevent Xia from breaching the arrangement with TekTree.

On cross-examination, Borla stated that the arrangement between TekTree and Borla was for the benefit of Xia, and it received no profit or benefit, and that there was nothing that Borla could do to control Xia's actions, because she was no longer an employee of Borla.

Deborah Juszak, Vice President of Human Resources for Borla, testified concerning the invoice exchange, and payment process between TekTree and Borla. Juszak stated that she was responsible for providing invoices to TekTree for services performed off-site by Xia. Xia would report her hours worked on a weekly basis; Juszak would then provide the invoices to TekTree who would in turn send payment. When the payment came in, Juszak would pay Xia directly. Juszak's next involvement with Xia was when Xia communicated her intent to resign from Borla on April 25, 2012.[15] Juszak testified that she did not respond to the e-mail or further communicate with Xia until April 30, 2012, when Xia requested a release.[16] Juszak responded to the e-mail, refused to provide

---

[15] Joint Ex. 19.

[16] *See* Joint Ex. 4. Xia requested a release containing the following language: "Rongyu Xia has no obligations with Borla Performance after resignation and is free to work with any employer moving forward starting 4/30/2012."

6

the release, and advised Xia that for one year she was not permitted to provide any direct or indirect services to any clients introduced to her by TekTree, and that doing so could result in legal action against both Xia and Borla.[17]

Juszak testified that on May 3, 2012, she received a letter from TekTree which alleged Borla breached the Agreement.[18] Juszak forwarded the e-mail to Xia, and replied to TekTree stating that Xia had the legal right to resign from Borla, and that Borla met its contractual obligations by advising Xia that she could not work for any of TekTree's clients.[19]

On cross-examination by Borla, Juszak testified that Borla did all within its control when she advised Xia of her ongoing contractual obligations with TekTree. During cross examination by Xia, Juszak stated Xia was not a party to the agreement between TekTree and Borla. She also testified that Borla did not have a copy of the Note signed between TekTree and Xia, and that her communication with Xia was made with no knowledge that a separate agreement existed between TekTree and Xia. She clearly stated that Borla's communications with Xia between April 25 and April 30, 2012 were in regards to the agreement between TekTree and Borla.

Xia testified that she completed her master's degree January of 2010. At that point, her student visa was no longer valid; therefore, she was required to obtain a H1B employment visa to remain in the United States. Xia testified that in March 2011, she began to look for a job. After posting her resume to numerous career-building websites, she received a call from TekTree's Vice President concerning a position as a program analyst. She was told that the position came with a competitive salary and benefits.[20] Xia testified that during the phone conversation, the terms of employment, obligations and responsibilities of the parties was discussed. TekTree was obligated to provide training and a position with a client, and Xia was obligated to complete training and to

---

[17] Joint Ex. 5.
[18] Joint Ex. 6.
[19] *See* Joint Ex. 7.
[20] *See* Joint Ex. 10.

7

accept the position. Training was scheduled to occur in Michigan, beginning on June 6, 2011,[21] and continue for six to eight weeks. Xia testified the one-year non-compete clause was to start on the day her training began, which was June 13, 2011.

Xia signed the Note, and immediately relocated from North Carolina to Michigan to start training. Training began on June 13, 2011; however, the instructor had to relocate to India, and advised Xia that training would continue online. At this point, Xia moved back to North Carolina and completed the online training. After Xia completed her training, she states that she was told that she was responsible for training the next class of employees in Michigan. In July of 2011, she again drove to Michigan, she trained the employees, and on September 1, she moved back to North Carolina to continue her job search.

Xia received an employment offer from Open Systems, to work for Lincoln National. She learned that TekTree had posted her resume, and sold her services to Panzier. Panzier sold her services to its client, Open Systems, who in turn assigned her to work for its client, Lincoln National. Xia testified that TekTree did not have permission to sell her services. Xia began working on October 17, 2011 under this financial arrangement. In March of 2012, she received a call from Borla's human resources department and learned that TekTree had not sent payment, which was the reason she resigned. When she was shown the Agreement between TekTree and Borla, Xia stated that she had never seen the document.

On cross-examination by TekTree, Xia acknowledged that she was married in September 2011. Xia also contends that although she received her H1B visa from Borla Performance, she did not work for that company from October 2010 to October 2011. Rather, during that period Borla served as a mentor to Xia. Xia also admitted that after she resigned from Borla and TekTree, she used the Informatica-training to obtain her current position with Lincoln National.

---

[21] Training did not begin until June 13, 2011.

8

## ANALYSIS

### A. Claim on the Demand Note and Offer of Employment

To prevail on a claim for breach of contract, the plaintiff must establish by a preponderance of the evidence that: (1) a contract existed between the parties; (2) the defendant breached an obligation imposed by the contract, and (3) the plaintiff suffered damages as a result of that breach.[22]

While it is clear that TekTree and Xia executed the Demand Note, there is conflicting testimony whether the parties complied with terms such that a binding contract came into existence. Xia testified that when she arrived for training in Michigan, shortly thereafter the trainer had to leave the country. The testimony of TekTree executive Bandi on this point is not clear that training was provided as stated in the agreement.

Xia argues that TekTree first breached the agreement by failing to provide the necessary training. Xia contends that TekTree only provided basic training which is available to the public, and would cost $300.00. TekTree denied the allegation at trial, but Xia's position is more credible given the factual context in which these matters unfold. Xia also argues that TekTree's failure to provide the H1 B Visa as promised constitutes a material breach. While Bandi testified that Xia did not provide the necessary documents to TekTree, and as such TekTree could not move forward with the process until the documents were provided, I do not find this position persuasive. Finally, Xia contends that TekTree never secured "direct employment" for her, a material breach of the contract. The record is clear that Xia never was an employee of TekTree. The best that can be stated for TekTree is that, they are the seller of talent and services they may find at American educational institutions.

Accordingly, the facts in the record do not establish that TekTree provided the services in the Demand Note for which it seeks compensation. Further, the employment contract provides

---

[22] *Gregory v. Frazer*, 2010 WL 4262030, *1 (Del. Com. Pl. Oct. 8, 2010); *VLIW Technology, LLC v. Hewlett-Packard, Co.,* 840 A.2d 606, 612 (Del. 2003).

9

that TekTree would pay Xia's salary where there is no evidence that this occurred. Further, the agreement provides that it shall become effective when the HIB visa is approved, which did not occur. In essence, Xia never became an employee of TekTree; therefore, the employment agreement did not become an enforceable contract because the pre-conditions were never met.

**B. Validity of the Non-Solicitation/Non-Compete clause, and claim for Tortious Interference.**

Xia contends that the non-solicitation clause found in the contract is invalid because it does not prescribe any temporal limitation on the enforcement of the clause. In support of this assertion, Xia directs the Court to Bandi's testimony at trial that the clause banned her from working for Lincoln National indefinitely. While it is true that Bandi testified that the contract was expected to last for one to three years, he did not state that the clause's applicability was to last for that time. His testimony was that TekTree expected to make a profit from the contract for that time.

Additionally, the terms of the contract suggest that the clause would be binding for the time period after Xia's training ended; in the event that employment began, the clause would be enforceable up to one year after the termination date of the employment.[23] The difficulty here is that Xia never actually became a TekTree employee. She was paid by Borla, who received the amounts from TekTree, which was paid by Lincoln Financial to Panzier. There is no testimony that Xia received any payment from TekTree with a base salary of $50,000.00, nor any benefits or medical insurance coverage. Therefore, since Xia never actually became an employee of TekTree, the claim in the non-solicitation and non-compete clause must fail.

**Delaware Courts follow Section 766 of the Restatement (Second) of Torts** in assessing a tortious interference claim. To prevail in such claim, Plaintiff must show that: "(1) there was a

---

[23] *See* Joint Ex. 1, ¶1. "[T]he Maker [Xia] shall not voluntarily terminate his relationship with TekTree, LLC for a period of one year after the completion of training and *subsequent employment*." (Emphasis added).

10

contract; (2) that the defendant knew of the contract; (3) an intentional act was a significant factor in causing the breach of contract; (4) the act was done without justification; and (5) it caused injury."[24]

Xia argues that she did not interfere with the relationship because Lincoln National is not a direct client of TekTree. This argument, however, is not supported by facts because, as stated *supra*, Lincoln National is an end client of TekTree through Open Systems. Open Systems is a client of Panzier, another consulting firm, who was a direct client of TekTree. Moreover, the testimony from the parties indicates that Xia did not come into contact with Lincoln National (her present employer) *but for* the relationship which existed between TekTree, Open Systems, Panzier, and Lincoln National.

The testimony in the record establishes there was a contract between TekTree and Lincoln National where Xia provided the services. The fact that TekTree paid Borla, who paid Xia, makes it unmistakably clear there is a contract for which she must have had knowledge. Further, Xia's act was intentional. She was informed by Borla that she was prohibited from accepting employment. While she states that she resigned from Borla because she was not paid, I do not find this assertion sufficient justification for her actions. Finally, Bandi testified that his company anticipated profits from the arrangement with Lincoln National.

Even giving Xia the benefit of the doubt, her actions establish that she was aware of Lincoln's relationship with TekTree. After ending her employment with Borla, who had served as an intermediary between TekTree and Xia for the purposes of providing payment from Lincoln, Xia's request for a release letter from Borla, coupled with her beginning employment directly with Lincoln National three days later, suggests that Xia was at least aware that she was prohibited from

---

[24] *Wave Division Holdings, LLC v Highland Capital Management, L.P.,* Del. Supr., 49A3rd 1168 (2012)

11

working directly for Lincoln at the time of her resignation.[25] Therefore, I conclude that the facts establish there was a contract between TekTree and Lincoln for which she was aware and she, without justification, tortiously interfered with the agreement.

TekTree seeks $20,000.00 from Borla, claiming that Borla failed to take "all necessary assurances" to prevent Xia from breaching the contract, as required under the Professional Services Agreement signed November 3, 2011.[26] Paragraph 14 of the agreement provides:

> "[d]uring the term of this agreement and for a period of twelve months thereafter, vendor [Borla] shall not …solicit, recruit or hire any person who is presently or during the non-solicitation period becomes an employee of TekTree, unless such person is involuntarily discharged by TekTree or twelve months has elapsed since the voluntary resignation of such person."[27]

The facts indicate that when Xia requested the release from Borla, Borla denied her request.[28] Moreover, Borla advised Xia that she cannot provide any direct or indirect services to any clients to which she has been introduced, or from whom she will receive information from, including "end clients and any intermediary clients/entities."[29] However at this time, Xia was no longer an employee of Borla as April 30, 2012; thus there is no reasonably conceivable scenario in which Borla could have exercised control over Xia or her actions on May 3, 2012, other than advise her of the prohibition. Therefore, there are no facts to support this claim by TekTree, and I find that Borla did not breach the non-solicitation clause in the Professional Services Agreement.[30]

---

[25] *See* Joint Ex. 4. Xia's proposed language for the release states "Rongyu Xia has no obligations with Borla Performance after resignation and is free to work with any employer moving forward starting 4/30/2012 (*sic*)."

[26] *See* Joint Ex. 3.

[27] Joint Ex. 3, ¶ 14.

[28] Joint Ex. 16.

[29] *Id.*

[30] Borla argues that the agreement is invalid because TekTree did not sign the agreement. However, the well-settled law of Delaware is where an agreement is signed by the party against whom enforcement is sought, the contract will be enforced.

12

Xia brings three counterclaims against TekTree: breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. Since I conclude that the pre-conditions were not met, and no contract between the parties came into existence, this claim must fail. Further, there is no basis for her claim for breach of the implied covenant of good faith and fair dealing for the alleged misrepresentation that TekTree would employ Xia directly, provide her a salary and benefits, and have her H1 B visa transferred. The Court of Chancery held:

> The implied covenant of good faith "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." This doctrine emphasizes "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Cases invoking the implied covenant of good faith and fair dealing should be rare and fact-intensive. Only where issues of compelling fairness arise will this Court embrace good faith and fair dealing and imply terms in an agreement. Violating the implied covenant of good faith and fair dealing implicitly indicates bad faith conduct. The Delaware Supreme Court has explicitly held that a claimant must demonstrate that the conduct at issue involved fraud, deceit, or misrepresentation in order to prove a breach of the implied covenant.[31]

Xia has not put forth any documents which show fraud, deceit, or misrepresentation rising to the level of bad faith conduct by TekTree; nor did she present any evidence at trial to support this claim.[32] Therefore, the Court must deny her claim for breach of the implied covenant of good faith and fair dealing.

Finally, Xia relies upon promissory estoppel, alleging that TekTree should reimburse her for her expenses for relocating to Michigan twice; first for training, and then to train other employees. To prove promissory estoppel, Xia must show by clear and convincing evidence that:

> (1) [A] promise was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the

---

[31] *Continental Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1234 (Del. Ch. 2000) (internal citations omitted).
[32] *See* Joint Ex. 12. Xia states that, pursuant to a telephone conversation with Jan Panditi, Vice President of sales for TekTree, she "understands and accepts" how a consulting firm works. The email was dated May 27, 2014, eleven days before she signed the contract with TekTree.

13

promisee; (3) the promisee reasonably relied on the promise and acted to his detriment; and (4) that such a promise is binding because injustice will be avoided only by enforcement of the promise.[33]

Xia presented testimony supporting her claim for promissory estoppel, for which she seeks reimbursement.

TekTree in its post-trial submission seeks damages in excess of $72,000.00 from Xia and Borla on its claims. It is clear that Borla's actions did not constitute breach of contract and as to them it is unsupported. I find Borla did not breach the contract; therefore, no damages are assessed against Borla. Additionally, I conclude that there is no valid contract between Xia and TekTree. However, I do find that Xia tortiously interfered with TekTree's relationship with Lincoln Financial. Bandi testified TekTree was earning $3,024.00 per month on the arrangement. The agreement, if they were deemed valid, provided that Xia was required to not terminate her position for 12 months, following training. Xia testified she went to Michigan for training on June 11, 2011 and completed the online training July 1, 2011. Juszak testified Xia resigned from Borla on April 30, 2012.

Therefore, the twelve (12) month period provided under the arrangement would end June 11, 2012. Thus TekTree, while stating it anticipated the relationship to last several years, it could only reasonably rely upon Xia to remain working until June 11, 2012. Damages for the loss is from the date of resignation and employment with Lincoln Financial until the end of the anticipated contract period with Lincoln Financial, which is two months for a sum of $6,024.00.[34]

Xia seeks damages of $50,000.00 for her counterclaims. Xia alleges that she is owed $22,000.00 for non-payment from June to October 2011. She also estimates that she was paid approximately $24,000.00 less than her contract required from October 2011 to April 2012,

---

[33] *Ramone v. Lang*, Del. Ch., 2006 WL 905347 at *14 (Apr. 3, 2006) (quoting *Chrysler Corp. v. Chaplake Holdings, Ltd.,* 822 A.2d 1024, 1032 (Del.2003); *Lord v. Souder,* 748 A.2d 393, 398-99 (Del. 2000); Restatement (Second) of Contracts § 90 (1981); Farnsworth on Contracts § 2.19, at 174).
[34] Joint Ex. 1 ¶ 1.

$5,000.00 in unpaid benefits, and $3,000.00 in relocation costs. Since I conclude the document signed by the parties did not create a valid contract, there is no basis to support the claims based upon contracts. However, the actual expense of $3,000.00 was incurred as a result of TekTree's inducement. The terms of the employment indicate that the effective date of the contract including payment and benefits, would start "as soon as your H1 B Petition is approved."[35] The uncontroverted evidence presented at trial is that Xia never provided the documentation to TekTree to acquire the visa. Moreover, while Xia introduced her W-2 tax forms,[36] there is nothing on the record which gives context to the W-2 forms or to justify her claim for damages. However, the claim for relocation expenses is supported by the testimony in the record.

On the claims for Tortious Interference, TekTree is awarded the sum of $6,024.00. This amount is reduced by $3,000.00 awarded to Xia. The final award to TekTree is $3,024.00, costs and post-judgment interest at the legal rate, until paid.

SO ORDERED

_____
Alex J. Smalls,
Chief Judge

[35] Joint Ex. 2.
[36] Joint Ex. 9.